EDWARD C. TIDWELL
5157 Roundup Way
Antioch, California 94531
Telephone: (510) 470-8422
Email: edwardctidwell@yahoo.com

Plaintiff in Pro Se

E-filing

FILED
JUN - 7 2013
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

# UNITED STATE DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD C. TIDWELL, <br><br> Plaintiff, <br><br> vs. <br><br> JPMORGAN CHASE BANK, N.A., CHASE HOME FINANCE LLC, JP CHASE HOME HOME FINANCE, JPMC SPECIALTY MORTGAGE LLC, FORMERLY KNOWN AS WM SPECIALTY MORTGAGE LLC, HOMESALE, INC., RUST CONSULTING, INC., PROMMIS SOLUTIONS, LLC, CAL-WESTERN RECONVEYANCE CORPORATION, NRT, LLC, COLDWELL BANKER RESIDENTIAL BROKERAGE COMPANY, VALLEY OF CALIFORNIA, INC., COLDWELL BANKER RESIDENTIAL BROKERAGE CORPORATION, and DOES 1 through 10, inclusive, <br><br> Defendants. | CASE NO.: **C13-2621** <br><br> **COMPLAINT FOR DAMAGES (VERIFIED)** <br><br> 1) Violation of 12 U.S.C. §§ 1813 and 1818 ET SEQ. <br> 2) Violation of 12 U.S.C. §§ 2601 and 2605 ET SEQ. <br> 3) Violation of California Civil Code §§ 2923.5, 2923.52-55 and 2924 <br> 4) Violation of California Penal Code § 115 <br> 5) Misrepresentation <br> 6) Unfair Business Practices and Violation of California Business and Professions Code §§ 17200-17210 ET SEQ. <br> 7) Violation of California Corporation Code §§17050, 17051 and 17456 <br> 8) Declaratory Relief <br> 9) Injunctive Relief <br><br> **JURY TRIAL DEMANDED** |

///
///
///

1

## INTRODUCTION

1.     EDWARD C. TIDWELL ("PLAINTIFF" or "TIDWELL") commence this action is to seek monetary compensation, the Cancellation of Trustee's Deed Upon Sale, a Deed of Reconveyance and absolute justice in connection with the illegal non-judicial foreclosure sale on February 4, 2011 of his property.

2.     The real property is located in the City of Antioch, County of Contra Costa, and is commonly known as 5157 Roundup Way, Antioch, California 94531, and it shall be referred to herein as the "Roundup Way" property or the "Property" that is described as follows:

**"Lot 522, as shown on the Map of Subdivision 7620, filed March 10. 1994,**

**Map Book 371, Page 3, Contra Costa County Records, California – APN: 056-230-030-1"**

3.     As a result of the Independent Foreclosure Review process under Category 2 of the United States of America, Department of the Treasury, Office of the Comptroller of the Currency ("Comptroller" or "OCC"), and the Board of Governors of the Federal Reserve System's ("FRB") Financial Remediation Framework of June 21, 2012, the illegal foreclosure sale is to be rescinded. The Trustee's Deed Upon Sale recorded on February 22, 2011 with the Contra Costa County Recorder's Office ("Recorder") under their recordation number DOC-2011-0038938-00 is unenforceable and is to be voided.

4.     JPMORGAN CHASE BANK, N.A.'s ("CHASE BANK") unsafe or unsound banking practices, and their fraudulent and predatory mortgage loan servicing and illegal foreclosure sale practices, together with their third-party providers' unfair business practices and their outside Counsels' legal maneuvers and manipulative tactics are the subjects of this litigation.

5.     Chase Bank and CHASE HOME FINANCE LLC's ("CHASE HOME") violations of the laws of the United States of America and the State of California, which has jurisdiction and legal authority to punish and hold Defendants responsible for their willful misconduct and negligent misrepresentation pursuant to the Real Estate Settlement Procedures Act ("RESPA") 12 U.S.C. §§ 2601 and 2605 et seq. and its implementing regulation, Regulation X 24 C.F.R. Part 3500 or any additional or successor legislation or regulation and applicable laws that govern matters under Plaintiff's Deed of Trust ("Deed"), which Chase Bank and Chase Home violated as described in

2

Article I of the OCC's Consent Order issued on April 13, 2011 against Chase Bank that a true and correct copy of is attached hereto as *Exhibit A*.

6.      To register its Limited Liability Company ("LLC") with the State of California, Secretary of State ("Secretary"), Chase Home filed on January 20, 2005 its Articles of Organization, and on the same date of its formation according the Secretary's Certificate of Status dated April 3, 2012, Chase Home filed a Certificate of Cancellation that is attached hereto as *Exhibit B,* which evidence the Secretary of this State prohibit Chase Home from transacting intrastate business as a Foreign LLC pursuant to California Corporation Code §§ 17050, 17051 and 17456.

7.      In the Superior Court of California, Contra Costa County, Martinez-Case No.: C11-02461 that is designated Edward C. Tidwell vs. JPMorgan Chase & Company, et al., Plaintiff filed on April 27, 2012, his Request for Judicial Notice ("RJN"), which attached as *Exhibit 3* to the RJN is the Secretary's Certificate of Status as to Chase Home that was granted by the Court on May 2, 2012.

8.      To preserve his legal rights to bring a claim to fully recover his property, on June 11, 2012, Plaintiff filed in the Superior Court of California, Contra Costa County, Martinez-Case No.: C11-02461 a Request for Dismissal dismissing without prejudice his Second Amended Complaint for Damages (Verified) ("SAC") filed on February 27, 2012 against JPMorgan Chase & Company ("Chase"), Chase Bank and Chase Home, and on June 25, 2012, Plaintiff dismissed without prejudice JPM Specialty Mortgage LLC, formerly known as WM Specialty Mortgage LLC.

9.      Plaintiff as a direct result of Chase Bank and Chase Home's illegal foreclosure sale practices has suffered injuries and harm and irreparable damages and inconveniencies if this Court does not issue a Preliminary and Permanent Injunction or a Temporary Retraining Order ordering Chase Bank and Chase Home to immediately cease from going forward with the listing of Plaintiff's property on the real estate market for sale, and forbidding them from selling or causing to be sold and conveying, granting, assigning or transferring Plaintiff's Deed attached hereto as *Exhibit C* through escrow close and going forward with any wrongful unlawful detainer eviction proceeding.

10.     Plaintiff executed on August 2, 2005 the Deed (the Security Instrument), the Adjustable Rate Riders together with the Promissory Note ("Note") that was recorded under recordation number DOC-2005-0305754-00, which shows Plaintiff entered in to a contractual relationship with

3

COMPLAINT FOR DAMAGES (VERIFIED)
Edward C. Tidwell v. JPMorgan Chase Bank, N.A., et al.

ARGENT MORTGAGE COMPANY, LLC ("ARGENT") as the Beneficiary and TOWN and COUNTRY TITLE SERVICES, INC. ("TCT") as the Trustee.

## PARTIES

11.   Plaintiff believes and thereon alleges that each Defendant identified herein is a registered State or Foreign business entity authorized by this State's Secretary to "transact intrastate business" pursuant to the appropriate California Corporation Code.

12.   Plaintiff believes and thereon alleges JPMORGAN CHASE BANK, N.A. ("CHASE BANK") is a Delaware Corporation conducting business at 4 New York Plaza 19, New York, New York 10004.  According to the Delaware Secretary, Chase Bank's Agent for Service of Process is The Corporation Trust Company c/o JPMorgan Chase Bank, N.A., Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

13.   Plaintiff believes and thereon alleges CHASE HOME FINANCE LLC ("CHASE HOME") is a Delaware LLC situated at 194 Wood Avenue S, Iselin, New Jersey 08830.  Chase Home's Agent for Service of Process is The Corporation Trust Company c/o Chase Home Finance LLC-File No.: 3881786, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, and according to the OCC and the Delaware Secretary, Chase Home merged with and into Chase Bank around May 1, 2011.

14.   Plaintiff believes and thereon alleges RUST CONSULTING, INC. ("RUST") is a Corporation conducting business at 201 S Lyndale Avenue, Faribault, Minnesota 55021 as an Independent Consultant and Settlement Administrator for Chase Bank as described under the OCC's Consent Order.

15.   Plaintiff believes and thereon alleges HOMESALE, INC. ("HOMESALE") is a Corporation conducting business at 800 Brooksedge Blvd, Westerville, Ohio 43081 as an affiliate or associate of Chase Bank.

16.   Plaintiff believes and thereon alleges JP MORGAN CHASE HOME FINANCE ("CHASE FINANCE") is a Corporation conducting business and sharing office space with Homesale at 800 Brooksedge Blvd, Westerville, Ohio 43081 as an affiliate and associate of Chase Bank.

17.   Plaintiff believes and thereon alleges JPMC SPECIALTY MORTGAGE LLC, formerly

4

known as WM SPECIALTY MORTGAGE LLC ("JPM") is not registered with the Secretary of this State as a Foreign LLC, however, JPM as an affiliate and associate of Chase Bank use 7255 Baymeadows Way, Jacksonville, Florida 32256 as its business location.  JPM's Corporation ID is File No.: 325685 and its Agent for Service of Process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

18.   Plaintiff believes and thereon alleges NRT, LLC ("NRT) is a Delaware LLC conducting business at 1 Campus Drive, Parsippany, New Jersey 07054.

19.   Plaintiff believes and thereon alleges COLDWELL BANKER RESIDENTIAL BROKERAGE COMPANY ("COLDWELL BANKER") is a California Corporation operating as a NRT subsidiary, and according to this State's Secretary, Coldwell Banker is conducting business at 1801 N. California Blvd, Suite 100, Walnut Creek, California 94596 as a surrendered, dissolved or merged out entity.

20.   Plaintiff believes and thereon alleges COLDWELL BANKER RESIDENTIAL BROKERAGE CORPORATION ("COLDWELL") is not registered with the Secretary of this State.

21.   Plaintiff believes and thereon alleges VALLEY OF CALIFORNIA, INC. ("VACI") is a NRT subsidiary d/b/a Coldwell Banker at 12657 Alcosta Blvd, Suite 500, San Ramon, California 94583.

22.   Plaintiff believes and thereon alleges PROMMIS SOLUTIONS, LLC ("PROMMIS") is a Delaware LLC conducting business at 1544 Old Alabama Road, Roswell, Georgia 30076 as the parent of Cal-Western

23.   Plaintiff believes and thereon alleges CAL-WESTERN RECONVEYANCE CORPORATION ("CAL-WESTERN") is a Corporation conducting business at 525 East Main Street, El Cajon, California 92020 as a Prommis subsidiary.

24.   Plaintiff at all pertinent times throughout this litigation shall refer to each party identified as named or collectively as ("DEFENDANTS").

25.   Plaintiff is ignorant of the true names and capacities of the Defendants, All Persons Unknown, Claiming Any Legal or Equitable Right, Title, Stake, Lien, or Interest in the Property Described in the Complaint adverse to Plaintiff's Title, or any Cloud on Plaintiff's Title to that Property, and Does 1 through 10, and therefore, Plaintiff sues these Defendants by those fictitious

5

COMPLAINT FOR DAMAGES (VERIFIED)
Edward C. Tidwell v. JPMorgan Chase Bank, N.A., et al.

names as mentioned herein as Does 1 through 10, inclusive. Each of these fictitiously named Defendants are responsible in some manner for the illegal activities alleged in this Complaint. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

26.  Whenever reference is made in this Complaint to any act of any corporate or other business Defendant, that reference shall mean that the corporation or other business did the acts alleged in this Complaint through its officers, directors, agents, representative, employees or otherwise while they were acting within the actual or ostensible scope of their authority.

27.  Plaintiff believes and thereon alleges at all times pertinent, each of the Defendants were agents, representatives, beneficiaries, trustees, grantors, grantee, assignors, assignees, transferors, transferees, predecessor, successor, servants, employers, employees, affiliates, associates, third-party providers or otherwise of their Co-Defendants, and each of them, in doing the things hereinafter alleged, are claiming to act within the scope of their authority as agents, representatives, beneficiaries, trustees, , grantors, grantees, assignors, assignees, transferors, transferees, predecessor, successor, servants, employers, employees, affiliates, associates, third-party providers or otherwise and with the permission, consent, authorization and ratification of their Co-Defendants.

28.  At all relevant times, each Defendant knew or by the exercise of reasonable care should have known, that the other Defendants were engaging in or planning to engage in illegal and unlawful conduct, nevertheless, each Defendant facilitated the commission of those unlawful acts. Each Defendant intended to and did encourage, facilitate or assisted in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

29.  The allegations in this Complaint shall mean that each Defendant acted individually and jointly with the other Defendants and at all relevant times, each Defendant has committed the acts, caused others to commit the acts, ratified the commission of the acts, or permitted others to commit the acts alleged herein and has made, caused, ratified or permitted others to make, the untrue or misleading statements alleged in each Causes of Action in this Complaint.

## JURISDICTION

30.  This action arises under 28 U.S.C. § 1331, Federal Question jurisdiction in accordance with the appropriate statutory and common law that are within the jurisdiction of this Court. The

6

Court also has supplemental jurisdiction over the pendant State law claims because the State law claims are so related to the Federal claims that they form part of the same case or controversy under Article III of the United States Constitution pursuant to 28 U.S.C. § 1367. Additionally, the real property location and RESPA violations, the illegal foreclosure sale processes, and unfair business practices alleged herein were committed in the Northern District of California within this Court's jurisdiction pursuant to 12 U.S.C. § 2614 and 12 U.S.C. § 1391(b).

## **PRIOR LAWSUITS**

31.   In his continuous efforts to prove JPM the Beneficiary, Chase Bank and Chase Home the Mortgage Loan Servicers wrong for authorizing Cal-Western the Trustee to conduct the illegal foreclosure sale on his property that he has had the pleasures of referring to as home, Plaintiff has endure severe hardship, embarrassment and much sufferings. Loss of love, divorce and separation from his children has at times been almost unbearable.

32.   This action is Plaintiff's claim that is intended to fully recover his property, which as noticed the pleadings presented have carved a path to State and Federal Court, and as further noticed the Court has never rebuked or accursed Plaintiff of filing frivolous complaints, motion or other merit less pleadings. Plaintiff, and with much respect, truly appreciate this Court's consideration given during its examination of Cause of Action presented herein.

33.   As best as Plaintiff recall the case name and number of prior lawsuits, and the name of the Court in which they were filed are as follow:

- Edward C. Tidwell vs. Argent Mortgage Company, LLC, et al.
  Superior Court of California, Contra Costa County, Martinez-Case No.: C08-00573

- Edward C. Tidwell vs. JPMorgan Chase and Company, et al.
  Superior Court of California, Contra Costa County, Martinez-Case No.: C10-02022

- Edward C. Tidwell vs. JPMorgan Chase & Company, et al.
  United States District Court, Northern District of California-Case No.: C11-01145CRB

- Edward C. Tidwell vs. JPMorgan Chase & Company, et al.
- Superior Court of California, Contra Costa County, Martinez-Case No.: C11-02461

34.   Commencing around March 10, 2008 upon filing his initial claim against Argent and several other Defendants, Plaintiff believed and thereon alleged Defendants used fraudulent and felonious mortgage loan and foreclosure related documents to induce and eventually steal Plaintiff

and many homeowners' title to their property.  Upon the Court's request Plaintiff will provide sufficient facts to support his contentions that Argent's underwriting department, without Plaintiff knowledge or consent allowed forged Uniform Residential Loan Application and unsigned Internal Revenue Service Form 1040s to be used to approved the residential loan transaction.

35.   As evidenced herein the Comptroller of the Currency of the United States of America, and various State and Federal governmental agencies finally heard the cry and eventually heeded to the obvious afflictions of homeowners throughout this State who have been victimized by Defendants Chase Bank, Chase Home and many other financial institutions who've cause reckless havoc on this State causing massive damages upon families and entire communities.

36.   Plaintiff's Complaint for Damages (Verified) will give this Honorable Court a heartbreaking glimpse from several angles of the legal maneuver and manipulative tactics utilized by Defendant Chase Home who according to this State's Secretary, Defendant Chase Home formed its Foreign Limited Liability Company on January 20, 2005 and on the same day Defendant Chase Home filed a Certificate of Cancellation, nevertheless, as a direct result of their illegal foreclosure sale practices Defendants Chase Home and Chase Bank practically single handedly forced homeowners in this State into homelessness.

37.   The undisputed facts to support Plaintiff's claim as mentioned herein are these:

**I**
**GENERAL ALLEGATIONS**
**(Illegal Foreclosure Sale of Plaintiff's Property)**

38.   Leading up to the illegal foreclosure sale on February 4, 2011 of Plaintiff's property, on April 13, 2011 the OCC issued its Consent Order In the matter of JPMorgan Chase Bank, N.A., New York, New York-AA-EC-11-15 that indicates:

> "The Comptroller of the Currency of the United States of America
> ("Comptroller"), through his national bank examiners and other staff of the
> Office of the Comptroller of the Currency ("OCC"), as part of an interagency
> horizontal review or major residential mortgage servicers, has conducted an
> examination of the residential real estate mortgage foreclosure processes of
> JPMorgan Chase Bank, N.A., New York, New York ("Bank").  The OCC
> has identified certain deficiencies and unsafe or unsound practices in
> residential mortgage servicing and in the Bank's initiation and handling of
> foreclosure proceedings.  The OCC has informed the Bank of the findings
> resulting from the examination".

8

39.   Pursuant to 12 U.S.C. §§ 1813(q) and 1818(b) the Comptroller under the authority vested in him through his national bank examiners and other staff of the OCC, as part of an interagency horizontal review of major residential mortgage servicers conducted and examination of the residential real estate mortgage foreclosure processes of Defendant Chase Bank

40.   Defendant Chase Bank "is among the largest servicers of residential mortgages in the United States", Defendant Chase Bank "services a portfolio of 6,300,000 residential mortgage loans", which during the recent housing crisis, a substantially large number of residential mortgage loans serviced by Defendant Chase Bank became delinquent and resulted in foreclosure actions.

41.   As a direct result of Defendant Chase Bank's "deficiencies and unsafe or unsound" banking and foreclosure sale practices together with Defendants Chase Home's fraudulent and predatory mortgage servicing practices Plaintiff suffer injuries and harm and irreparable damages described in the OCC's Consent Order as follow:

    (a) filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principle and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made base on personal knowledge or based on review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records;

    (b) filed or caused to be filed in state or federal courts, or in local land records offices, numerous affidavits or other mortgage-related document that were not properly notarized, including those not signed or affirmed in the presence of a notary;

    (c) litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time; and

    (f) failed to sufficiently oversee outside counsel and other third- party providers handling foreclosure-related services.

42.   The OCC's findings provides undisputed facts that Plaintiff and homeowners throughout this State were victimized by Defendants Chase Bank and Chase Home illegal foreclosure sale practices, and as evidenced herein the facts presented indicates Defendants Chase Bank and Chase Home deliberately oppressed and caused reckless havoc upon Plaintiff and entire communities as a direct result of their predatory acts of unsafe or unsound banking and foreclosure practices.

9

43. Defendants Chase Bank and Chase Home never secured from Argent and Argent never granted, assigned and transferred all of its beneficial interest under the Deed with power of sale to Defendant JPM. The faulty Assignment of Deed of Trust ("ASSIGNMENT") attached hereto as *Exhibit D,* which was recorded on May 12, 2006 under recordation number DOC-2006-0150686-00 that was executed by Dana A. Rosas on May 8, 2006 as Authorized Agent for Argent by AMC Mortgage Services, Inc. ("AMC").

44. However, on October 23, 2006, Ms. Rosas as Authorized Agent executed a Substitution of Trustee ("Substitution") attached hereto as *Exhibit E* that shows the Riverside County Recorder's recordation number DOC # 2006-0889828 that was recorded on December 5, 2006 reflecting her employment as Authorized Agent for Deutsche Bank National Trust Company.

45. Three days after executing the Substitution on October 23, 2006 as Authorized Agent for Deutsche Bank National Trust Company, Ms. Rosas executed on October 27, 2006 as Authorized Agent for Argent by AMC an Assignment attached hereto as *Exhibit F* that was recorded on December 6, 2006 under their recordation number DOC-2006-0389226-00.

46. On October 27, 2006 Tamara Price, Vice President for Argent by AMC executed the Assignment attached hereto as *Exhibit F* and she executed the Substitution attached hereto as *Exhibit G* that bears recordation number DOC-2006-0389227-00, which shows Ms. Price's authority as Attorney-In-Fact for WM Specialty Mortgage LLC, without recourse by AMC.

47. Plaintiff believes and thereon alleges that the faulty Assignment and Substitution allegedly executed by Ms. Price during her employment with AMC at their Rancho Cucamonga, California office location in the County of San Bernardino wasn't executed in the presence of a licensed Notary, but were routed by AMC's "Foreclosure support mail documents team" to their Notary Department for notarization on October 27, 2006 by R.P. Umali at a location in Orange County California.

48. Fraud or at least malfeasance is evident in that Ms. Price testified under oath on Pages 8-9 of her Deposition attached hereto as *Exhibit H* that was taken at the Offices of Coastal Court Reporters, LLC in St. Augustine, Florida on April 21, 2008 by James A. Kowalski, Esq. of the Law Offices of James A. Kowalski that she was employed as AMC's Foreclosure Supervisor from

January 2006 through January 2007, however, she testified further on Pages 14-15 of her Deposition that her job title as Vice President of AMC commenced on February 26, 2007.

49. The Deposition of Ms. Price indicates AMC gave her signing authority of certain documents as Vice President "as of February 26, 2007" approximately four months after she executed the faulty Assignment and Substitution attached respectively hereto as *Exhibit F and G*, which she further testified on Pages 18-27 that she wasn't able to specifically identify the various documents presented throughout the day for her signature approval, and that on occasions the Notary (Larry Tolliver) did not see nor was he physically present in the same room when she affixed her signature to affidavits or other documents of various types.

50. Ms. Price testified even further that she was uncertain if Mr. Tolliver's notary stamp was affixed the same day she executed documents as Vice President for AMC and that "The department that does the documents picks up the signed documents and then presents them to the Notaries", which fortifies Plaintiff's claim of fraud or at least malfeasance in that it is obvious that the jurat or notarization seal of Ms. Umali may not have been stamped on the Assignment and Substitution on October 27, 2006. It is possible Ms. Price wasn't in the presence of Ms. Umali when she affixed her signature to the Assignment and Substitution.

51. The Deed attached hereto as *Exhibit C* reflects Argent as the Beneficiary and TCT as the Trustee, however, Defendant Cal-Western as Trustee for Argent caused the defective Notice of Default and Election to Sell Under Deed of Trust ("NOD") attached hereto as *Exhibit I* to be recorded on October 16, 2006 under recordation number DOC-2006-0327557-00, which was used by Defendant Cal-Western to conduct the illegal foreclosure sale of Plaintiff's property on February 4, 2011 on behalf of Defendant Chase Home as Mortgage Loan Servicer for Defendant JPM the Beneficiary. The NOD reflects Argent as the Beneficiary and it is defective in that it was prematurely recorded approximately two months prior to the recordation on December 6, 2006 of the required Substitution attached hereto as *Exhibit G* that was fraudulently executed on October 27, 2006 by Ms. Price as Vice President and Attorney-in Fact.

52. The faulty Substitution attached hereto as *Exhibit G* is in violation of RESPA in that Argent is shown as the Beneficiary and TCT is referred to as Argent's Trustee. Under the laws of

11

this State the Deed is a contract, a Security Instrument to secure a debt, which Defendant JPM is charged with the duty as the Assignee and a Holder of the Deed with power of sale to perform accordingly prior to commencement of any action to collect a debt or the foreclosure sale, and as such, Defendant JPM breached the contract immediately upon its failure to do so.

Uniform Covenants.  Section 15 of the Deed states in pertinent part:

> *Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means*. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise.  If any notice required by the Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.  (Emphasis added.)

Uniform Covenants.  Section 20 of the Deed states in pertinent part:

> *The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more* times without prior notice to borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  *If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.*  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.  (Emphasis added.)

> *Neither borrow or lender may commence, join, or be joined to any judicial action* (as either an individual litigant, or the member of a class, that arises from the other party's actions pursuant to this security instrument or that alleges that the other party has breached any provision of, or any duty by reason of, this Security Instrument, *until such borrower or lender has notified the other party (with such notice given in compliance with the requirements of section 15) of such alleged breach and afforded the other party hereto a reasonable period after giving of such notice to take corrective action.*  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for the purposes of this

paragraph. The notice of acceleration and notice to cure given to borrower pursuant to Section 22 and the notice of acceleration given to borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.  (Emphasis added.)

Uniform Covenants.  Section 24 of the Deed states in pertinent part:

Lender, at its options, may from time to time appoint *a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder* of the county in which the Property is located.  The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law.  This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.  (Emphasis added.)

53.    When there is a contract between the Beneficiary and Trustor, such as the Condition Precedent expressed in the Deed according to Applicable Law a foreclosure sale cannot take place before the condition is satisfied.  If the Beneficiary fails to carry out its obligation a subsequent foreclosure sale is invalid.  *Haywood Lumber & Investment Co. V. Corbett* (1934) 138 CA 644, 650, 33 P2d 41.  Defendant JPM as the Beneficiary never secured from Argent a legally executed Assignment prior to commencement of the foreclosure sale of Plaintiff's property, and Defendant JPM never executed or caused the required Assignment or Substitution to be recorded with the Recorder prior to recordation of the defective NOD, therefore, Defendant JPM lack standing to employ or enter into a contractual relationship with its affiliates and associates Defendants Chase Bank and Chase Home as Servicers for the purpose to authorize Defendant Cal-Western as Trustee to conduct the illegal foreclosure sale.

54.    Attached hereto as *Exhibit J* is the NOD recorded on May 8, 2006 that bears recordation number DOC-2006-0143809-00, which is enclosed with Lashon Harris, Esq.'s letter dated February 26, 2013 that is attached hereto as *Exhibit K.*  The NOD shows $15,444.97 as the total amount needed as of May 4, 2006 to satisfy the arrears to bring Plaintiff's account current was paid by World Savings Cashier/Teller's Check #2393741502 dated July 7, 2006 in the amount of $18,914.23 and Patelco Credit Union Check #100452921 dated July 7, 2006 in the amount of $2,774.78 attached hereto as *Exhibit L* that Plaintiff made payable to AMC.

13

55.   In addition to the defective NOD missing the required declaration, a Notice of Rescission of Notice of Default ("Rescission") attached hereto as **Exhibit M** that reflects recordation number DOC-2006-0229375-00 was recorded on July 20, 2006, therefore, the subject NOD is void and unenforceable.

56.   The Deposition of Ms. Price indicates she testified that AMC gave her signing authority as Vice President "as of February 26, 2007" approximately four months after she allegedly executed the faulty Assignment and Substitution attached hereto as **Exhibits G and H**, however, the Limited Power of Attorney attached hereto as **Exhibit N** clearly evidence Argent didn't appoint AMC as its true and lawful Attorney-in Fact until March 14, 2007 approximately five months after Ms. Price executed the Assignment and Substitution, which together with the faulty Assignment attached hereto as **Exhibit D** that was recorded on May 12, 2006 provides overwhelming facts that Argent never legally granted, assigned and transferred all of its beneficial interest under the Deed with power of sale to Defendant JPM.

57.   Defendants JPM as Beneficiary, Chase Home and Chase Bank as Servicers and Cal-Western as Trustee violations of RESPA, the OCC's Consent Order, and the Applicable Law of this State are evident in that the filing and recordation of fraudulent and felonious foreclosure documents, the Deposition of Ms. Price and the filing of Defendants Chase Bank and Chase Home's own pleadings, in addition to the enclosures to Ms. Harris' letter bear witness against them in that the NOD attached hereto as **Exhibit J**, which is enclosed with Ms. Harris' letter attached hereto as **Exhibit K** was cured by payment of the two Cashier's Checks attached hereto as **Exhibit L**. The defective NOD attached hereto as **Exhibit I** that was prematurely record on October 16, 2006 approximately two months prior to the recordation on December 6, 2006 of the required Substitution provide undisputed evidentiary facts as to Defendants JPM as Beneficiary, Chase Home and Chase Bank as Servicers and Cal-Western as Trustee violations of RESPA, the OCC's Consent Order, and the Applicable Law of this State.

58.   Attached hereto as **Exhibit O** is the Trustee's Deed Upon Sale that is enclosed with Ms. Harris' letter attached hereto as **Exhibit K** solidifies Plaintiff's contentions that Defendants JPM as Beneficiary, Chase Home and Chase Bank as Servicers and Cal-Western as Trustee violated RESPA

14

and the Applicable Law of this State, in addition to their violations identified in the OCC's Consent Order, which states Defendant Chase Bank for the purpose to fleece Plaintiff of title to his property, Defendant Chase Bank "failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services" such as Ms. Harris' firm and Defendants JPM, Chase Home and Cal-Western's filing and recording or that they caused to be filed and recorded in State and Federal Courts and Recorder's office the Trustee's Deed Upon Sale and other mortgage-related documents.

59.     The NOD attached hereto as ***Exhibit J*** that is the same NOD enclosed with Ms. Harris' letter attached hereto as ***Exhibit K*** was voided out by payment of the two Cashier's Checks attached hereto as ***Exhibit L***, which to support Plaintiff's contention attached hereto as ***Exhibit M*** is the Rescission that evidence the NOD was rescinded and cancelled, and the defective NOD attached hereto as ***Exhibit I*** was prematurely record on October 16, 2006 approximately two months prior to the recordation on December 6, 2006 of the required Substitution.  Plaintiff point here is exactly which NOD did Defendant Cal-Western as Trustee use to conduct the illegal foreclosure sale of Plaintiff's property on behalf of Defendants JPM as Beneficiary and Chase Bank and Chase Home?

60.     Consistent with the Honorable Arthur M. Schack, J.S.C. of the Supreme Court of the State of New York Decision & Order Index No.: 3724/07 attached hereto as ***Exhibit P*** that was entered on December 21, 2007 in Deutsche Bank National Trust Company vs. Reina Ezagui, et al., one of Justice Schack's primary concerns was the signing by Ms. Price of an Affidavit and an Assignment on or about February 7, 2007 and February 16, 2007.  Ms. Price executed the Affidavit under her employment contract as the Vice President of Deutsche Bank and she signed off on the Assignment under her employment contract as Vice President of AMC, which caused the Supreme Court to require that Ms. Price submit an affidavit describing her employment history for the past three years.  Justice Schack ordered that "further, irrespective of her employment history, Ms. Price must explain why Deutsche Bank would purchase a non-performing loan from Ameriquest".

61.     Beyond doubt it is evident Ms. Price lied about her employment title as Vice President of AMC during the signing of the Assignment and Substitution, and it is obvious Ms. Rosas lied too, and as required under the laws of the United States of America, it is the Court duty to act and uphold the law in the best interest of all parties with fervent intentions to find out exactly whose lying.

15

62.   Justice Schack's Decision & Order and the OCC's findings indicated in their Consent Order evidence Ms. Price and Ms. Rosas, and Defendants Chase Bank, Chase Home together with their third-party providers caused to be filed in State and Federal Courts, and recorded in the Recorders' offices various fraudulent and felonious foreclosure and mortgage-related documents, which were not properly notarized, and not signed or affirmed in the presence of a licensed Notary.

63.   Defendant Chase Home while illegally transacting intrastate business as described in the Secretary's Certificate of Status attached hereto as *Exhibit B* and posing as Defendant JPM's mortgage servicer, Defendant Chase Home in addition to its violation of California Corporation Code §§ 17050, 17051 and 17456 and California Civil Code §§ 2923 and 2924, Defendants Chase Bank and Chase failed to comply with the due diligence requirements outlined under California Civil Code § 2923.5 in that at no time whatsoever as the beneficiary or mortgage servicer did Defendants Chase Bank and Chase Home as required by law make contact with Plaintiff for the purpose to offer Plaintiff to participate in their loan modification program.

### Summary Description and History of California Civil Code § 2923.5

64.   On or about July 8, 2008, Governor Schwarzenegger signed into law Senate Bill 1137 (the "Bill"). This Act, also known as the Perata Mortgage Relief Bill, was subsequently codified as California Civil Code § 2923.5, and it governs any residential mortgage executed between January 1, 2003 and December 31, 2007.

65.   Among the protections which the statute contains for borrowers in foreclosure is a mandatory notification, meeting, and consultation process that must be made available to the borrower by the foreclosing lender, mortgage, trustee, beneficiary, or authorized agent, prior to filing a NOD under California Civil Code § 2924. As a direct result of the fraudulent and predatory residential mortgage servicing and "unsafe or unsound banking" and illegal foreclosure sale practices of Defendants Chase Bank and Chase Home, the Bill states for "the economic health of California for the state to ameliorate the deleterious effects on the state economy local economies and the California housing market that will result from the continued foreclosures of residential properties in unprecedented numbers" Section 1(d) of the Bill states it is "modifying the foreclosure process to require mortgages, beneficiaries, or authorized agents to contact borrowers and explore

options that could avoid foreclosure".

66.     The OCC's Consent Order provide infallible proof that Defendant Chase Bank services a portfolio of 6,300,000 residential mortgage loans across the United States of America, Defendant Chase Bank's foreclosure inventory grew substantially from January 2008 through December 2010 causing Plaintiff and other homeowners in this State to become homeless, which in essence prompted the State of California to declare a state of emergency as described in Section 1(d) of the Bill that states "the state's foreclosure process are essential to ensure that the process does not exacerbate the current crisis by adding more foreclosures to the glut of foreclosed properties already on the market when a foreclosure could have been avoided".

67.     The illegal foreclosure sale of Plaintiff's property and other homeowners' property throughout this State certainly could have been avoided in that Defendant Chase Home was prohibited by the California Secretary from transacting intrastate business as early as January 20, 2005 over three years prior to this State's downward spiral primarily caused by Defendants Chase Bank and Chase Home's foreclosure processes.

68.     California Civil Code § 2923.5 also contains additional requirements that the lenders, mortgagees, trustees, beneficiaries or their authorized agents must comply with prior to filing a NOD pursuant to California Civil Code § 2924 until 30 days after contact is made.  The section requires that "A mortgagee, beneficiary, or authorized agent shall contact the borrow in person or by telephone in order to access the borrower's financial situation and explore options for the borrower to avoid foreclosure", which it is evident Defendant Chase Home did not do prior to the illegal foreclosure sale on February 4, 2011, because Defendant Chase Home was not authorized by this State to "transact intrastate business".

69.     During the initial contact, the mortgagee, beneficiary, or authorized agent shall advise the borrower that he or she has the right to request a subsequent meeting and, if requested, the mortgagee, beneficiary, or authorized agent shall schedule the meeting to occur within 14 days. Plaintiff contends that pursuant to California Civil Code § 2923.5 the law mandates that a good faith discussion take place regarding assessment of Plaintiff's financial situation, which the discussion of options may occur during the first contact, or at the subsequent meeting scheduled for that purpose.

17

In either case, Plaintiff was to be provided with a toll-free telephone number made available by the United States Department of Housing and Urban Development ("HUD") to find a HUD-certified housing counseling agency to assist him with his foreclosure situation.

70.   A NOD recorded pursuant to California Civil Code § 2924 shall include a declaration from the mortgagee, beneficiary, or authorized agent that it has contacted Plaintiff, or tried with due diligence to contact Plaintiff as required by law.  Defendants Chase Bank and Chase Home failed to perform the due diligence requirements as evident according to the NOD attached hereto as ***Exhibit I and J*** in that neither NOD includes a valid declaration executed under penalty of perjury.

71.   California Civil Code § 2923.5(c) specifically provides that if a mortgagee, trustee, beneficiary, or authorized agent, has recorded a NOD prior to the enactment of § 2923.5, then the mortgagee, trustee, beneficiary, or authorized agent shall, as part of the Notice of Trustee's Sale ("NOT") attached hereto as ***Exhibit Q*** the NOT must include a valid declaration that states (1) Plaintiff was contacted to assess his financial situation and to explore options for him to avoid foreclosure, and (2) list the efforts made, if any, to contact Plaintiff in the event no contact was made.  The NOT was recorded on May 27, 2010 under recordation number DOC-2010-0106061-00 and attached to the NOT is Defendant Chase Home's Declaration of Compliance pursuant to California Civil Code § 2923.5(c).

72.   The purpose of permitting a declaration under penalty of perjury, in lieu of a sworn statement, is to help ensure that the declarations contain a truthful factual representation and are made in good faith.  (*In re Marriage of Reese & Guy*, 73 Cal.App.4[th] 1214, 87 Cal. Rptr. 2d 339 (4th Dist. 1999).  We need not look any farther than the NOD attached hereto as ***Exhibit I and J*** to find the declaration is missing as mandated by California Civil Code § 2923.5(c).  (*Blum v. Superior Court* (Copley Press Inc.) (2006) 141 Cal App 4th 418, 45 Cal. Rptr. 3d 902).  The NOD attached hereto as ***Exhibit I*** is missing the declaration, therefore, since the declaration is missing the NOD is defective as a matter of law.

**Summary Description and History of California Civil Code §§ 2923.52 and 2923.53**

73.   In addition to California Civil Code § 2923.5 enacted due to the yet astronomical increase in residential property foreclosures throughout California, Governor Schwarzenegger again around

18

June 1, 2009 signed into law the Foreclosure Prevention Law Act ("FPLA") codified as California

Civil Code §§ 2923.52 and 2923.53, which the purpose of its enactment was to govern residential

mortgages executed between January 1, 2003 and December 31, 2007.

74.     Article 1 of the FPLA requirements under § 2031.1 is adopted to clarify the application of

California Civil Code §§ 2923.52 and 2923.53 and set forth the requirements for a comprehensive

loan modification program under § 2923.53 in order for a mortgage loan servicer to obtain an order

of exemption from § 2923.52.  The modification of loans in conformance with the Home Affordable

Modification Program Guidelines issued by the U.S. Department of the Treasury on March 4, 2009,

as amended (the "Guideline"), shall constitute the implementation of a comprehensive loan

modification program that meets the requirements of subdivision (a) of California Civil Code §

2923.53, and shall be deemed to meet all of the requirements in this article (including § 2031.2,

2031.3, 2031.4, 2031.5 and 2031.6 of these rules).

75.     All other comprehensive loan modification programs shall comply with the minimum

standards to obtain an order from the State of California, Department of Corporation Commissioner

("Commissioner") for exemption from § 2923.52.  For an applicant to obtain an order of exemption

from California Civil Code § 2923.52, the comprehensive loan modification program shall, at a

minimum be available for borrowers and residential mortgage loans meeting the following

requirements: (1) the residential mortgage loan to be modified was recorded during the period of

January 1, 2003 to January 1, 2008, (2) the borrower occupies the property as his or her principal

residence, and occupied the property as his or her principal residence at the time the loan became

delinquent, (3) the loan is in default, and a notice of default has been filed with the county recorder

under California Civil Code § 2923.53.

76.     Plaintiff's point here is that the Secretary of this State prohibited Defendant Chase Home

from transacting intrastate business (see ***Exhibit B*** attached hereto as Defendant Chase Home's

Certificate of Status), therefore, Defendant Chase Home did not qualify as a Foreign LLC to conduct

business in this State, in other words offer Plaintiff and homeowners in this State a modification.

77.     The Declaration page attached as an Exhibit to the NOT attached hereto as ***Exhibit Q*** was

executed by Ann Thorn, as First Vice President of Defendant Chase Home, as required under the

19

applicable laws of this State the Declaration does not comply with Exhibit (2) to the declaration of John Berens, Senior Vice President of Defendant Chase Home in that Mr. Berens declared under penalty of perjury that "The Applicant proposes to use the following declaration, either as a part of, or as an attachment to, the Notice of Sale", and he further declared in compliance with § 2923.54 that "The mortgage loan servicer will instruct the Trustee that the Trustee is authorized to sign on Applicant's behalf the statement" as required pursuant to § 2923.54.

78.    The declaration wasn't "made based on personal knowledge" or executed under penalty of perjury by Ms. Thorn, additionally, and Plaintiff reiterates here that Defendant Chase Home was prohibited by this State's Secretary from transacting intrastate business since January 20, 2005, however, Defendant Chase Home on June 11, 2009 submitted to the Commissioner their application for an order of exemption declaring under penalty of perjury that Defendant Chase Home's declaration attached as Exhibit (2) to their application would conform pursuant to § 2923.54.

79.    As Plaintiff discusses later Defendant Coldwell Banker on February 7, 2011 (see *Exhibit S* attached hereto) states Defendant Chase Home completed the foreclosure, however, Defendant Coldwell Banker states on September 14, 2011 (see *Exhibit S* attached hereto) that Defendant Chase Bank completed the foreclosure on Plaintiff's property, which is certainly a violation of the applicable laws of this State in that Defendant Chase Bank prior to the foreclosure never contacted Plaintiff to discuss his situation to avoid foreclosure.

80.    The declaration of Ms. Thorn that is attached as Exhibit to the NOT attached hereto as *Exhibit Q* indicates Ms. Thorn executed the declaration on behalf of Defendant Chase Home sometime around May 8, 2010, however, Defendant Chase Home didn't merger with and into Defendant Chase Bank until around May 1, 2011 according to the OCC's Conditional Approval #996 May 2011 attached hereto as *Exhibit T*.

81.    That by virtue of the method and manner of the illegal foreclosure sale practices of Defendants Chase Bank and Chase Home their non-compliance with California Civil Code §§ 2923.5, 2923.52-55 and 2924 renders the foreclosure <u>VOID</u> ab initio as a matter of law.

## II
## GENERAL ALLEGATIONS
### (Independent Foreclosure Review)

20

82.   Plaintiff reiterates here that the OCC's Consent Order attached hereto as *Exhibit A*
provide all the undisputed facts as to Chase Bank, Chase Home and its Third-Party Provider's unsafe
or unsound banking and illegal foreclosure sale practices that resulted in Plaintiff's real property
being stolen.

83.   Defendant Chase Bank was already under investigation prior to the OCC issuing its
Consent Order against Chase Bank on April 13, 2011, which by and through its duly elected and
acting Board of Directors ("Board"), Chase Bank willfully executed and knowingly agreed to the
issuance of the Consent Cease and Desist Order that Chase Bank committed itself to "taking all
necessary and appropriate steps to remedy the deficiencies and unsafe or unsound" banking and
foreclosure sale practices identified by the OCC.

84.   The Consent Order indicates Defendant Chase Bank around April 13, 2011 stipulated and
consented to enhancing its mortgage servicing and foreclosure processes, and that Defendant Chase
Bank have already begun implementing procedures to remediate its practices addressed in the Order.

85.   Under the dated of May 25, 2012, Plaintiff forwarded correspondence to the OCC via
U.S. Postal Service Priority Mail-Delivery Confirmation #0311 3260 0001 9801 5385 that addresses
several issues in detail that involves Plaintiff's Consumer Complaint filed with the OCC that is
identified as Edward C. Tidwell v. JPMorgan Chase Bank, N.A., which the OCC responded that its
office was the appropriate Federal banking agency with the authority to exercise jurisdiction
pursuant to 12 U.S.C. §§ 1813(q) and 1818(b) of Defendants Chase Bank and Chase Home's
fraudulent and predatory lending and mortgage servicing practices.

86.   In his May 25, 2012 correspondence to the OCC, Plaintiff called to their attention that he
was aware Defendants Chase Bank and Chase Home were in direct violation of the laws, rules and
regulations governed by the OCC as described under the National Bank Act of 1984 (12 U.S.C. 1 et
seq.) and the Federal Savings Associations Chartered under the Home Owners Loan Act of 1933 (12
U.S.C. 1461 et seq.), which the OCC's regulations derive from these acts, which are defined in
whole or in part in Title 12-Banks and Banking Code of Federal Regulations (12 CFR Parts 1-199.

87.   The OCC identified Defendant Chase Bank as one of the largest servicers of residential
mortgages in the United States that services a portfolio of Six Million Three Hundred Thousand

(6,300,000) residential mortgage loans, which during the housing crisis, a substantially large number of residential mortgage loans serviced by Defendant Chase Bank resulted in foreclosure, which included Plaintiff's property that as evidenced as a direct result of their illegal foreclosure processes in connection with Plaintiff's property their portfolio earned a victory minus one.

88.   Because of Plaintiff, Homeowners, Congress and the United States of America, the OCC and the Board of Governors of the Federal Reserve System ("FRB") on June 21, 2012 rolled out its Financial Remediation Framework attached hereto as *Exhibit R* for use in the Independent Foreclosure Review as part of the OCC's Consent Order against Defendant Chase Bank for their deficient mortgage servicing and foreclosure practices, which as indicated in the Consent Order and Stipulation and Order the orders resulted in Defendant Chase Bank to retaining Defendant Rust as their consultants to conduct a comprehensive review of foreclosures that were in process or completed in 2009 or 2010 (the Independent Foreclosure Review) to identify financial injuries to borrowers that resulted from errors, misrepresentations, and other deficiencies in the foreclosure process.

89.   The Independent Foreclosure Review also required Defendant Chase Bank to provide monetary compensation or other remediation for identified financial injury.  The OCC and FRB developed a financial remediation framework that Defendants Chase Bank and Rust used to fleece Plaintiff of his benefits compensation described in Category 2 of the Framework.

90.   On June 22, 2012, Plaintiff submitted an electronic version of the Independent Foreclosure Review request form that bears Confirmation Code No.: E90272A27T, and in addition, Plaintiff followed up with a hard copy of the Independent Foreclosure Review request form that was enclosed with his correspondence dated June 29, 2012 to the Independent Review Administrator in Faribault, Minnesota.  Plaintiff provided the Independent Review Administrator with an extensive list of enclosures to aid in their review process.

91.   Plaintiff's Consumer Complaint filed against Defendants Chase Bank and Chase Home with the Consumer Financial Protection Bureau on October 3, 2012 led to countless pieces of correspondence, enclosures and exhibits that provided undisputed facts that Defendants Chase Bank and Chase Home stole title to Plaintiff's property.  The CFPB correspondence dated November 14, 2012 informed Plaintiff that "The *Independent Foreclosure Review* is providing homeowners the

opportunity to request an independent review of their foreclosure process. If the review finds that financial injury occurred as a result of errors, misrepresentations or other deficiencies in the servicer's foreclosure process, the customer may receive compensation or other remedy. Your bank has informed the CFPB that you may potentially be eligible".

92.   Plaintiff has suffered extreme and almost unbearable harm and irreparable damages a result of the loss and use of his property. Defendant Rust as the Independent Consultant and Settlement Administrator for Defendant Chase Bank was required to use the Framework to assess Plaintiff's injuries due to Defendants Chase Bank and Chase Home's foreclosure process, servicing errors, misrepresentations and other deficiencies.

93.   Plaintiff eligibility for benefit compensation and remediation under the Framework as a direct result of Defendants Chase Bank and Chase Home's mortgage servicing errors, misrepresentations, financial injury and other deficiencies are described in Category 2 of the Framework, which indicates in the column designated "Error" Plaintiff's default occurred "as a direct result of servicer error" and in the column identified as "Foreclosure Complete" Plaintiff's "Remedy" should have been to "Rescind foreclosure when possible; pay $15,000, correct servicer record for any improper amounts, and correct credit reports", and the "Dollar Payment" should have at least been $15,000, additionally, according to the Framework "If rescission of foreclosure is not possible; pay $125,000 plus equity, remedy deficiency, and correct credit report", and the "Dollar Payment" should have been $125,000 plus equity.

94.   The Framework Frequently Asked Questions (FAQs) of November 30, 2012 indicates in Item 17 under Rescission that rescission of foreclosure is possible when the following exist:

- Federal law, State law, judicial, and local practice permits the action;
- The home has not already been transferred or sold to a third-party; and
- The servicer action does not result in underwriting a new loan if the servicer lacks legal authority to underwrite a new loan (e.g., the servicer does not currently possess loan originator licenses from the appropriate federal or state authority) or is not in the business of originating loans.

95.   In addition to the conditions listed in Item 17 of the FAQ for Category 2, the borrower must also expressly indicate that they want to stay in the home or return to the home, which as evidenced in Plaintiff's correspondence of June 29, 2012 to the Independent Review Administrator

23

"my primary objectives are to fully recover my real property by the recordation of the required Notice of Rescission of Notice of Default, Notice of Cancellation of Trustee's Deed Upon Sale, Deed of Reconveyance and any related documents necessary to be recorded with the Contra Costa County Recorder's Office, Martinez, California to rescind, cancel and cause to be null and void in its entirety the Trustee's Deed Upon Sale bearing recordation number DOC-2011-0038938-00 that was recorded on February 22, 2011".

96.   Shortly after receiving Defendant Rust's notice in mid March 2013 regarding payment eligibility, Plaintiff forwarded correspondence dated March 29, 2013 to the Independent Review Administrator and Defendant Rust to call to their attention that Plaintiff intended to fully recover his property as described in the OCC's Consent Order, Stipulation and Order, Framework and FAQ.

97.   In Plaintiff's correspondence of March 29, 2013 to Defendant Rust, Plaintiff specifically called to their attention that consistent with their findings as a result of their review and investigation, and as indicated in his correspondence to the OCC dated May 25, 2012, because Defendants Chase Home and JPM violated the laws of the State of California in that these entities "transacted intrastate business", it is evident the foreclosure sale was not in compliance with California Corporation Code §§ 17050, 17051 17456, California Civil Code §§ 2923.5, 2923.52-55, 2924 and California Penal Code § 115, therefore, Plaintiff is eligible benefit compensation under Category 2 of the Framework.

98.   Plaintiff forwarded correspondence dated April 2, 2013 to Defendant Rust via U.S. Postal Service Regular Mail and Facsimile (507) 333-4330 with the intent to establish payment arrangements and to determine the manner the foreclosure rescission documents would be compiled and recorded.  Defendant Rust responded with correspondence dated April 26, 2013, which attached to their correspondence was a measly check payable to Plaintiff in the amount of Five Hundred Dollars ($500.00) with no clear explanation as required under the Framework why the check was issued or if Plaintiff should expect other remedies such as credit repair.

### III
### GENERAL ALLEGATIONS
#### (Listing on Real Estate Market and Selling of Plaintiff's Property)

99.   During the examination by the Comptroller's national bank examiners of Defendant

24

Chase Bank's residential real estate mortgage foreclosure processes, Defendant Chase Bank was in breach of the Consent Order while the Stipulation and Order was being negotiated and compiled in that under the date of February 7, 2011, Plaintiff received an Important Notice Regarding Your Occupancy of the Property (This is Not a Notice to Vacate) attached hereto as **Exhibit S** from Theresa Soares, a Real Estate Agent with Coldwell Banker, which states "[Chase Home Finance LLC/EMC Mortgage Corporation] [("Chase")/("EMC")], in its capacity as mortgage loan servicer and on behalf of the owner, completed a foreclosure proceeding on the property located at 5157 Roundup Way Antioch CA 94531".

100.  Uniform Covenants.  Section 20 of the Deed states in pertinent parts: **Neither borrow or lender may commence, join, or be joined to any judicial action** (as either an individual litigant, or the member of a class, that arises from the other party's actions pursuant to this security instrument or that alleges that the other party has breached any provision of, or any duty by reason of, this Security Instrument**, until such borrower or lender has notified the other party (with such notice given in compliance with the requirements of section 15) of such alleged breach and afforded the other party hereto a reasonable period after giving of such notice to take corrective action**.

101.  Article I of the Comptroller's Findings identified as Items (a) thru (f) of the OCC's Consent Order more specifically described above in para. 38 provides overwhelming evidence that Defendants Chase Bank and Chase Home on behalf of its affiliate and associate Defendant JPM caused Randall D. Naiman, Esq. of the Naiman Law Group, PC to file a Complaint For Unlawful Detainer on March 8, 2011 in the Superior Court of California, County of Contra Costa, Pittsburg that is designated JPMC Specialty Mortgage LLC f/k/a WM Specialty Mortgage LLC-Case No.: PS11-0418.  The unlawful detainer eviction proceedings commenced by Mr. Naiman's firm evidence Defendant Chase Bank as indicated in the OCC's Consent Order failed to sufficiently oversee "outside counsel and other third-party providers handling foreclosure-related services".

102.  Plaintiff had no prior knowledge or part in drafting the Deed, only the execution thereof; Plaintiff contends that the aforementioned language contained in the Deed creates a condition precedent prior to commencement of the foreclosure sale of Plaintiff's property, without first giving written notice to perform a covenant.  Defendants JPM as the Beneficiary, Chase Bank and Chase

1  Home as the Servicers and Cal-Western as the Trustee violated RESPA, California Civil Code §§

2  2923.5, 2923.52-55 and 2924 in that sufficient notice was never mailed or delivered to Plaintiff by

3  Mr. Naiman's firm or Defendants JPM, Chase Bank and Chase Home or Cal-Western.

4       103.  By virtue of the fact that this action involves an unlawful detainer eviction a forfeiture of

5  Plaintiff's right to possession, the Courts strictly construe the statutory proceedings which regulate

6  it.  *Kwok v. Bergen*, (1982) 130 Cal.App.3d 596, 600, 181 Cal.Rptr. 795.  The failure of Defendants

7  JPM as the Beneficiary, Chase Bank and Chase Home as the Servicer and Cal-Western as the

8  Trustee to perform any condition, to wit, failure to give Plaintiff notice and a reasonable period to

9  cure a breach of the terms and conditions, cancels the performance of Plaintiff, until the condition

10  precedent is performed according to the terms of the Deed.

11       104.  Defendant JPM lack standing to authorize Defendants Chase Bank and Chase Home as

12  Servicers and Cal-Western as Trustee to commence the foreclosure sale of Plaintiff's property,

13  Defendants JPM, Chase Bank, Chase Home and Cal-Western must prove that they are authorized to

14  perform under the Deed according to RESPA and the Applicable Law to prosecute an unlawful

15  detainer eviction proceeding pursuant to a legally conducted foreclosure sale.  Plaintiff raise

16  overwhelming defense that the foreclosure sale was invalid because it was not processed in strict

17  compliance with California Civil Code §§ 2923.5 and 2924.

18       105.  Plaintiff reiterates here that the NOD attached hereto as *Exhibit J* that is the same NOD

19  enclosed with Ms. Harris' letter attached hereto as *Exhibit K* was voided out by payment of the two

20  Cashier's Checks attached hereto as *Exhibit L*, which to support Plaintiff's contention attached

21  hereto as *Exhibit M* is the Rescission that evidence the NOD was rescinded and cancelled, and the

22  defective NOD attached hereto as *Exhibit I* was prematurely record on October 16, 2006

23  approximately two months prior to the recordation on December 6, 2006 of the required

24  Substitution.  Plaintiff point is exactly which NOD did Defendant Cal-Western as Trustee use to

25  conduct the illegal foreclosure sale of Plaintiff's property on behalf of Defendants JPM as

26  Beneficiary and Chase Bank and Chase Home as Servicers?

27       106.  Defendant Chase Bank as indicated in the OCC's Consent Order failed to sufficiently

28  oversee Mr. Naiman's firm as "outside counsel and other third-party providers handling foreclosure-

related services", which is evident in that Defendants JPM and Chase Home were prohibited by the Secretary of this State from transacting intrastate business pursuant California Corporation Code §§ 17050, 17051 17456.  Defendant JPM caused Mr. Naiman's firm to commence a judicial proceeding in violation of RESPA and California Civil Code §§ 2923.5 and 2924.  Additionally, the NOD were defective and the faulty Assignment and Substitution were not legally executed or recorded in violation of California Penal Code § 115.

107.  Defendant Chase Bank violated and breached the OCC's Consent Order and Stipulation and Order on September 18, 2011 in that via Hand Delivery, Plaintiff received an Important Notice Regarding Your Occupancy of the Property (This is Not a Notice to Vacate) attached hereto as *Exhibit S* from Cheryl Carter, a Real Estate Agent with Coldwell Banker, which states "JP Morgan Chase Bank, National Association, in its capacity as mortgage loan servicer and on behalf of the owner, completed a foreclosure proceeding on the property located at_5157 Roundup Way Antioch CA 94531".

108.  Plaintiff's concerns are consistent with those Justice Schack addressed in his Decision & Order attached hereto as *Exhibit P,* which evidence fraud or at least malfeasance as to Ms. Price's employment history; similarly, the Notice served on Plaintiff by Ms. Soares of Defendant Coldwell Banker bear witness against Defendant Chase Home in that Defendant Chase Home's privileges to operate as a Foreign LLC was cancelled effective January 20, 2005, nevertheless, Defendant Chase Home employed Defendant Cal-Western as Trustee, and entered into a contractual relationship with Defendants NRT and Coldwell Banker for the purpose to list on the real estate market and force sell of Plaintiff's property that he has had the pleasures of referring to as home since January 2002.

109.  Further to Justice Schack's Decision & Order as to Ms. Price's employment history, in addition to Ms. Price's testimony in her Deposition, Plaintiff call to the Court's attention that just as Ms. Price lied under oath, it is obvious Ms. Soares and Ms. Carter is lying too.

110.  The illegal foreclosure sale of Plaintiff's property occurred on February 4, 2011, Ms. Soares indicated in her notice of February 7, 2011 (see attached *Exhibit S*) that Defendant Chase Home employed her as their real estate agent after the foreclosure sale was "completed", however, Ms. Carter stated in her notice of September 14, 2011 (see attached *Exhibit S*) that Defendant Chase Bank employed her as their real estate agent after the foreclosure sale was "completed".

111.  Fraud or at least malfeasance is apparent in that the felonious recordation of the faulty Substitution attached hereto as *Exhibit G*, the Assignment attached hereto as *Exhibit H* were recorded on December 6, 2006 after recordation on October 16, 2006 of the defective NOD attached hereto as *Exhibit I* that does not bear witness of Defendants Chase Bank and Chase Home's claim that Argent granted, assigned and transferred all of its beneficial interest with power of sale under the Deed attached hereto as *Exhibit C* to Defendant JPM, therefore, the foreclosure sale was not in strict compliance with California Civil Code §§ 2923.5, 2924 and its subparts.

112.  According to their correspondence dated April 15, 2011 attached hereto as *Exhibit T* described as Conditional Approval #996 May 2011, the OCC conditionally approved Chase's application to merge Chase's two subsidiaries Defendant Chase Home with and into Defendant Chase Bank, which evidence Defendant Chase Home transacted intrastate business in violation of this State's laws during the illegal foreclosure sale on February 4, 2011 as a Foreign LLC after filing of its cancellation on January 20, 2005.  As indicated in the OCC's Consent Order and Conditional Approval, Defendant Chase Home acted as Defendant Chase Bank's third-party service provider and Mortgage Loan Servicer to their affiliate and associate Defendant JPM for the purpose to fleece and steal title to Plaintiff's property.

113.  The OCC's Conditional Approval #996 May 2011 evidence Defendant Chase Home's merger with and into Defendant Chase Bank around May 2011, which provides undisputed facts that Ms. Carter lied in Defendant Colwell Banker's Notice attached hereto as *Exhibit S* dated September 14, 2011 about Defendant Chase Bank's completion of the foreclosure of Plaintiff's property. Defendants Chase Bank and Chase Home were obviously making a desperate attempt to employ and utilize the services of Defendants NRT and Coldwell Banker to force Plaintiff from his home.

114.  Defendants Chase Bank and Chase Home's own Motion to Dismiss that "outside counsel" will file in this action shall bear witness against them in that Defendants Chase Bank and Chase Home's pleadings and exhibits shall undoubtedly make "various assertions, such as ownership of the mortgage note and mortgage" and Deed in violation of the OCC's Consent Order.

115.  Ms. Ms. Price and Ms. Rosas as reflected on the faulty Substitution attached hereto as *Exhibit G* and the Assignment attached hereto as *Exhibit F* represent that their "assertions in the

28

COMPLAINT FOR DAMAGES (VERIFIED)
Edward C. Tidwell v. JPMorgan Chase Bank, N.A., et al.

affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases" such as Plaintiff's situation "they were not based on such personal knowledge or review" or 'properly notarized, including those not signed or affirmed in the presence of a notary" contrary to Ms. Price's testimony in her Deposition.

## FIRST CAUSE OF ACTION
### Violation of 12 U.S.C. §§ 1813(g) and 1818(b) ET SEQ.

116.  Plaintiff re-alleges and hereby incorporates by reference into this cause of action each and every preceding paragraph of this Complaint as though fully set forth herein at length.

117.  During the February 4, 2011 illegal foreclosure sale of Plaintiff's property by Defendant Chase Home, the national bank examiners and other staff members of the OCC were conducting an examination of Plaintiff and other residential real estate mortgage foreclosure processes of Defendant Chase Bank, which as a result of the examination the OCC "identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in Defendant Chase Bank's initiation and handling of foreclosure related proceedings utilized to fleece Plaintiff of his home.

118.  By reason of the conduct set forth herein that evidence Defendant Chase Bank's unsafe or unsound banking and illegal foreclosure sale practices, the OCC pursuant to 12 U.S.C. §§ 1813(a) and 1818(b) et seq. issued its Consent Order against Defendant Chase Bank on April 13, 2011, which Plaintiff asserts during the examination and compilation of the Stipulation and Consent Order, Defendant Chase Bank was already in breach of the Consent Order in that Defendant Chase Bank's "employees or employees of third-party service providers" together with Defendant Chase Bank's "outside counsel and other third-party providers handling foreclosure-related services" filed and recorded or caused to be filed and recorded in State and Federal Courts and Recorder's Offices numerous pleadings and mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a licensed notary.

119.  For their violations as mentioned herein Plaintiff seeks to recover his monetary benefit compensation in the amount of $125,000.000 plus equity and other remedies from Defendants Chase Bank and Rust as described in Category 2 of the OCC and FRB's Framework.

120.  As a direct and proximate result of Defendant Chase Bank's breach and violation of the

29

OCC's Consent Order and the Stipulation and Order, Plaintiff has suffered injuries, harm and irreparable damages.

121.   Wherefore Plaintiff requests relief as set forth below and herein.

## SECOND CAUSE OF ACTION
### Violation of 12 U.S.C. §§ 2601 and 2605 ET SEQ.

122.   Plaintiff re-alleges and hereby incorporates by reference into this cause of action each and every preceding paragraph of this Complaint as though fully set forth herein at length.

123.   Pursuant to Section P as defined under the Deed the refinance loan in connection with Plaintiff's Deed is subject to the federal RESPA and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in Plaintiff's Deed, "RESPA" refers to all requirements and restrictions that are imposed in regard to the "federal related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

124.   On July 5, 2012, Plaintiff sent a Qualified Written Request ("QWR") via U.S. Postal Service Priority Mail-Delivery Confirmation #0311 3260 0001 9801 5477 to Defendant Chase Bank, and the same QWR was sent via U.S. Postal Service Priority Mail-Certified Mail #7011 2000 0001 2693 9290 with Return Receipt Requested to Defendant Chase Home.  The USPS.com Track & Confirm inquiry indicates the QWR was delivered to Defendant Chase Bank on July 9, 2012, and the USPS.com Track & Confirm inquiry and the return receipt indicates the QWR was also delivered to Defendant Chase Home on July 9, 2012.

125.   The QWR was sent to Defendants Chase Bank and Chase Home in accordance with the OCC and the FRB's (federal bank regulators) requirements outlined to submit a Request for Review Form for an Independent Foreclosure Review to assess Plaintiff's financial injuries as a result of Defendants Chase Bank and Chase Home's errors, misrepresentations or other deficiencies made during the illegal foreclosure processes of Plaintiff's property.  Section 6 of RESPA required that within twenty (21) business days Defendants Chase Bank and Chase Home were to provide a written response to Plaintiff's QWR and within sixty (60) business days Defendants Chase Bank and Chase Home were to exhaust every meaningful effort to resolve the concerns addressed in the QWR.

126. Plaintiff complained to the Superior Court of the State of California, Contra Costa County, the OCC, the CFPB and the State of California, Department of Justice, Attorney General Office ("DOJ") that Defendants Chase Bank and Chase Home failed to timely comply with the requirements pursuant to RESPA 6.

127. On February 26, 2013, Ms. Harris finally forwarded correspondence to Plaintiff that is attached hereto as *Exhibit K*, which states "We are in receipt of your correspondence dated July 5, 2012, addressed to "Chase" as related to the above referenced property (the "Subject Property"). The Letter purports to be a Qualified Written Request ("QWR") under the Real Estate Settlement Procedures Act ("RESPA"), 12 USC § 2605(e)".

128. Over seven months after Defendants Chase Bank and Chase Home violated RESPA 6 in that a timely response was not provided to Plaintiff, Ms. Harris indicates that "the Letter does not qualify as a QWR", however, she states "please accept this letter as a formal response" on behalf of our client. Even if Plaintiff's QWR did not fully "qualify as a QWR as the term is defined under RESPA", it is evident Ms. Harris' letter provide sufficient facts that Defendants Chase Bank and Chase Home defaulted in that their reply did not comply with RESPA 6.

129. The QWR contained pertinent information to enable Defendants Chase Bank and Chase Home to identify Plaintiff's loan and it also contained adequate request under RESPA for information about Plaintiff's loan and property. Ms. Harris' legal maneuvers and manipulative tactics utilized in her letter bear witness against Defendants Chase Bank and Chase Home in that she enclose a copy of the Deed that supports Plaintiff claim that Argent as the Beneficiary and TCT as the Trustee is shown on the Deed attached hereto as *Exhibit C*.

130. The remaining documents Ms. Harris enclosed with her letter consist of the NOD attached hereto as *Exhibit J*, which was satisfied by payment of two cashier's checks payable to AMC that resulted in the recordation of the Rescission mentioned in para. 55. The subject NOD was satisfied by payment of the two cashier's check, in addition, it was recorded on May 8, 2006 prior to recordation on May 12, 2006 of the faulty Assignment enclosed with Ms. Harris's letter, which a copy of the subject Assignment is attached hereto as *Exhibit D* that is more specifically referred to commencing with para. 43.

131. The Substitution enclosed with Ms. Harris' letter is faulty in that it was recorded on December 6, 2006 approximately seven months after recordation on May 8, 2006 of the NOD, and in addition, the Substitution attached hereto as *Exhibit G* that is more specifically referred to commencing with para. 43 reflects Argent as the Beneficiary instead of Defendant JPM.

132. In accordance with the OCC's Consent Order and as instructed in the Request for Review Form submitted to the Independent Foreclosure Review, the QWR notified Defendants Chase Bank and Chase Home of the errors, misrepresentations and other deficiencies involving their "unsafe or unsound banking" and illegal foreclosures practices in connection with Plaintiff's property.

133. As required pursuant to RESPA and Regulation X, Defendants Chase Bank and Chase Home were to timely respond and comply with Section 6 of RESPA 12 U.S.C. § 2605. Section 6 violations are further defined by Regulation X 24 C.F.R. § 3500.21(e) as "Duty of loan servicer to respond to borrower inquiries".

134. Defendant Chase Bank and Chase Home violated Section 6 of Regulation X upon receipt of Plaintiff' s QWR when they neglected to respond in a timely manner with the intent to resolve the matter by rescinding the illegal foreclosure sale of Plaintiff's property thereby causing the Trustee's Deed Upon Sale enclosed with Ms. Harris' letter to be void and unenforceable.

135. Plaintiff reiterates here that consist with Article I-Comptroller's Finding of the OCC's Consent Order, Ms. Harris' letter provides undisputed facts Defendant Chase Bank "failed to sufficiently oversee outside" counsel's handling of the legal aspect of Defendants Chase Bank and Chase Home's foreclosure-related services. Additionally, as "outside counsel" retained to represent Defendant Chase Bank, Ms. Harris' own letter bear witness against Defendants Chase Bank and Chase Home as described in the OCC's Consent Order in that the fraudulent and felonious foreclosure-related documents were filed and recorded in "state and federal courts, or in local land records offices" making various assertions of Defendants Chase Bank and Chase Home's ownership of title to Plaintiff's property.

136. Consistent with para. 38 the OCC's Consent Order, it is evident the declaration to the NOT attached hereto as *Exhibit Q* doesn't conform in strict compliance with California Civil Code §§ 2923.5 and 2923.52-55, and in addition, the declaration wasn't "made based on personal

32

knowledge" or executed under penalty of perjury by Ms. Thorn.  Although, Defendant Chase Home was prohibited by this State's Secretary from transacting intrastate business since January 20, 2005, Defendant Chase Home on June 11, 2009 submitted to the Commissioner their application for an order of exemption declaring under penalty of perjury that Defendant Chase Home's declaration attached as Exhibit (2) to their application would conform pursuant to § 2923.54.

137.  The declaration page attached as an Exhibit to the NOT that was executed by Ms. Thorn does not comply with Exhibit (2) to the declaration of Mr. Berens that was received by the Commissioner on June 12, 2009.  Mr. Berens declared under penalty of perjury in the declaration attached to Defendant Chase Home's Application submitted to the Commissioner that "The Applicant proposes to use the following declaration, either as a part of, or as an attachment to, the Notice of Sale", and he further declared in compliance with § 2923.54 that "The mortgage loan servicer will instruct the Trustee that the Trustee is authorized to sign on Applicant's behalf the statement" as required pursuant to § 2923.54.

138.  Throughout Plaintiff's Complaint in particular commencing with para. 43 it is evident Argent never granted, assigned or transferred its beneficial interest under the Deed with power of sale to Defendant JPM, and Defendants JPM never secured from Argent a valid executed Assignment reflecting Defendant JPM as the Beneficiary.  Attached hereto as ***Exhibit B*** is Defendant JPM's Certificate Of No Record and according to the Certificate of Status (attached hereto as ***Exhibit B***) as to Defendant Chase Home that was granted by the Court (see para. 7) evidence this State's Secretary prohibit Defendants Chase Home and JPM from transacting intrastate business.

139.  As a direct and proximate result of Defendants Chase Bank and Chase Home's violation of RESPA and Regulation X by, Plaintiff has suffered injuries, harm and irreparable damages.

140.  Wherefore Plaintiff requests relief as set forth below and herein.

### THIRD CAUSE OF ACTION
#### Violation of California Civil Code §§ 2923.5, 2923.52-55 and 2924

141.  Plaintiff re-alleges and hereby incorporates by reference into this cause of action each and every preceding paragraph of this Complaint as though fully set forth herein at length.

142.  Defendants Chase Bank and Chase Home as mortgage loan servicers and Defendant Cal-

33

1   Western as Trustee for Defendant JPM the Beneficiary violated California Civil Code §§ 2923.5,

2   2923.52-55 and 2924 in that the illegal foreclosure sale of Plaintiff's property was not performed in

3   strict compliance with the laws of this State.

4       143.  As stated herein the illegal foreclosure sale of Plaintiff's property on February 4, 2011 by

5   Defendant Cal-Western was not performed under the defective NOD and NOT in strict compliance

6   with California Civil Code §§ 2923.5, 2923.52-55 and 2924, therefore, title was not perfected.

7       144.  Commencing with para. 99 and throughout this Complaint it is evident Defendant

8   Coldwell Banker's Notice Regarding Your Occupancy of the Property (This is Not a Notice to

9   Vacate) dated February 7, 2011 that is attached hereto as ***Exhibit S*** indicates Defendant Chase Home

10  "in its capacity as mortgage loan servicer and on behalf of the owner, completed a foreclosure

11  proceeding", however, the Defendant Coldwell Banker's Notice Regarding Your Occupancy of the

12  Property (This is Not a Notice to Vacate) dated September 14, 2011 also attached hereto as ***Exhibit***

13  ***S*** indicates Defendant Chase Bank "in its capacity as mortgage loan servicer and on behalf of the

14  owner, completed a foreclosure proceeding".

15      145.  In addition to Defendants Chase Bank and Chase Home use of the defective NOD and

16  faulty Assignment and Substitution and other fraudulent and felonious mortgage-related documents

17  to fleece Plaintiff of title to his property, it is evident that the findings in the OCC's Consent Order

18  indicates Defendant Chase Bank made assertions and false representations of their ownership of the

19  Deed and Note in connection with Plaintiff's property, which Defendants Chase Bank and Chase

20  Home filed and recorded or knowingly caused to be filed and recorded in State and Federal Court

21  and the Recorder's office.

22      146.  As identified in the OCC's Consent Order, Defendant Coldwell Banker upon entering

23  into their contractual relationship as one of Defendant Chase Bank's "employees" or "third-party

24  providers", Defendant Colwell Banker made assertions and false representations as evidenced in

25  their Notice Regarding Your Occupancy of the Property (This is Not a Notice to Vacate) with the

26  willful intent to aid Defendants Chase Bank and Chase Home in their scheme to swindle Plaintiff of

27  title to his property by listing on the real estate market for sale and selling Plaintiff's property

28  thereby transferring his Deed through escrow close.

147. Plaintiff reiterates here that the illegal foreclosure sale of his property under the defective NOD and NOT was not performed in strict compliance with California Civil Code §§ 2923.5, 2923.52-55 and 2924, therefore, title was not perfected.

148. Commencing with para. 38 and throughout his Complaint, Plaintiff contends that the laws of this State requires that Defendants Chase Bank, Chase Home, JPM and Cal-Western asserted and made false representations to Plaintiff that they are the servicers, mortgagee, trustee and beneficiary, therefore, it is required that California Civil Code §§ 2923.5, 2923.52-55 and 2924 be complied with prior to recordation of the defective NOD, and faulty Assignment and Substitution and other mortgage-related documents for the purpose to foreclosure and authorize the sell of Plaintiff's home.

149. Furthermore, attached hereto as ***Exhibit B*** is Defendant JPM's Certificate Of No Record and according to the Certificate of Status (attached hereto as ***Exhibit B***) as to Defendant Chase Home that was granted by the Court (see para. 7) evidence this State's Secretary prohibit Defendant Chase Home from transacting intrastate business.

150. As a direct and proximate result of Defendants Chase Bank, Chase Home, JPM and Cal-Western's violations Plaintiff has suffered injuries, harm and irreparable damages.

151. Wherefore Plaintiff requests relief as set forth below and herein.

### FOURTH CAUSE OF ACTION
### Violation of California Penal Code § 115

152. Plaintiff re-alleges and hereby incorporates by reference into this cause of action each and every preceding paragraph of this Complaint as though fully set forth herein at length.

153. Consistent with the Comptroller Findings identified in the OCC's Consent Order that states Defendant Chase Bank knowingly through its employees or employees of third-party service providers and their outside Counsel and other third-party providers handling foreclosure-related services violated California Penal Code § 115 in that Defendants Chase Bank, Chase Home, JPM and Cal-Western filed and recorded or caused to be filed and recorded against Plaintiff's property in State and Federal Courts and the Recorder's office numerous pleadings and mortgage-related documents making assertions for the purpose to fleece Plaintiff of ownership of his property by filing and recording felonious documents such as the NOD, Assignment, Substitution, NOT and Notice of Trustee's Deed Upon on Sale.

California Penal Code § 115 that states in pertinent parts:

(a) Every person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States, is guilty of a felony.

(b) Each instrument which is procured or offered to be filed, registered, or recorded in violation of subdivision (a) shall constitute a separate violation of this section.

154. Defendant Chase Bank by their own admission in Ms. Harris' letter attached hereto as **Exhibit K** admit to the Comptroller Findings in the OCC's Consent Order that evidence Defendants Chase Bank, Chase Home, JPM and Cal-Western's violations stated herein and their violation of RESPA, which as reflected in Section C and D of the Deed, Argent and TCT are referred to respectively as the Lender/Beneficiary and Trustee.

155. Under RESPA and the laws of this State the Deed is considered a contract, a Security Instrument to secure a debt that Defendants Chase Bank and Chase Home as Servicers, JPM as the Beneficiary and Cal-Western as Trustee is charged with the duty under the Deed with power of sale to perform accordingly prior to commencement of any action to collect a debt or the foreclosure sale.

156. Attached hereto as **Exhibit B** is Defendant JPM's Certificate Of No Record and according to the Certificate of Status (attached hereto as **Exhibit B**) as to Defendant Chase Home that was granted by the Court (see para. 7) evidence this State's Secretary prohibit Defendant Chase Home from transacting intrastate business.

157. Pursuant to RESPA 12 U.S.C. § 2601 et seq. as used in Plaintiff's Deed it is required in connection with a notice of transfer of servicing under Non-Uniform Covenants. Section 20 that if the Note (together with this Security Instrument) is sold to Defendant JPM the alleged beneficiary, and if there is a change of mortgage loan servicer from AMC on behalf of Argent the beneficiary as shown on the Deed, the new servicer Defendants Chase Bank and Chase Home as servicers on behalf of Defendant JPM were to give Plaintiff written notice to evidence said changes, which shall state the name and address of the new servicer, the address to which payment should be made and any other information under RESPA.

158. Defendant Chase Bank violated RESPA 12 U.S.C. § 2601 et seq. and breached the OCC's Consent Order and Stipulation and Order in that on September 18, 2011, Plaintiff received

36

via Hand Delivery from Ms. Carter of Defendant Coldwell Banker's Important Notice Regarding Your Occupancy of the Property (This is Not a Notice to Vacate) dated September 14, 2011 that is attached hereto as *Exhibit S*, which states Defendant Chase Bank "in its capacity as mortgage loan servicer" on behalf of the owner Defendant JPM, completed the foreclosure of Plaintiff's property.

159.  Defendant Chase Home as Defendant Chase Bank's third-party provider handling foreclosure-related services violated RESPA 12 U.S.C. § 2601 et seq. in that on February 9, 2011, Plaintiff received via U.S. Postal Service Regular Mail from Ms. Soares of Defendant Coldwell Banker, the Important Notice Regarding Your Occupancy of the Property (This is Not a Notice to Vacate) dated February 7, 2011 that is attached hereto as *Exhibit S*, which states Defendant Chase Home "in its capacity as mortgage loan servicer" on behalf of the owner Defendant JPM, completed the foreclosure of Plaintiff's property.

160.  It is evidenced in Plaintiff's Deed as required under RESPA 12 U.S.C. § 2601 et seq. that if the "Lender" Argent invokes the power of sale, Argent shall execute or cause its Trustee to execute a written notice of the occurrence. The Non-Uniform Covenants. Section 24 of Plaintiff's Deed states in pertinent parts:

> Lender, at its options, may from time to time appoint *a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder* of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

161.  Plaintiff executed the Deed attached hereto as *Exhibit C* that is the same Deed enclosed with Ms. Harris' letter that is attached hereto as *Exhibit K*, and as Plaintiff indicated commencing with para. 42 the NOD attached hereto as *Exhibit J* is the same NOD enclosed with Ms. Harris' letter that is attached hereto as *Exhibit K*, which was satisfied by payment of World Savings Cashier/Teller's Check #2393741502 dated July 7, 2006 in the amount of $18,914.23 and Patelco Credit Union Check #100452921 dated July 7, 2006 in the amount of $2,774.78 that were made payable to AMC. The two Cashier's Check are attached hereto as *Exhibit L* and the Rescission that

37

is attached hereto as *Exhibit M* was recorded on July 20, 2006, therefore, since the arrears were satisfied and the Rescission was recorded the NOD is rescinded and cancelled as a matter of law.

162.  By executing the Deed Plaintiff entered into a contract with Argent as the Lender and Beneficiary and AMC as the Servicer, and as reflected on the Deed TCT is Argent's Trustee.  As indicated commencing with para. 42 of his Complaint, Plaintiff attached hereto as *Exhibit D* a faulty Assignment that is enclosed with Ms. Harris' letter attached hereto as *Exhibit K,* the Assignment was recorded on May 12, 2006 four days after recordation on May 8, 2006 of the NOD attached hereto as *Exhibit J* that is enclosed with Ms. Harris' letter.  Again, the two Cashier's Checks attached hereto as *Exhibit L* paid off the NOD.

163.  Attached hereto as *Exhibit F* is a faulty Assignment that was recorded on December 6, 2006, which as Plaintiff indicated commencing with para. 42, this Assignment was executed on October 27, 2006 by Ms. Rosas as Authorized Agent for Argent by AMC, and on May 8, 2006 she executed the Assignment attached hereto as *Exhibit D* as Authorized Agent for Argent by AMC, however, three days prior to executing the Assignment as Authorized Agent for Argent by AMC, on October 23, 2006, Ms. Rosas as Authorized Agent for Deutsche Bank National Trust Company executed a Substitution attached hereto as *Exhibit E* that was recorded on December 5, 2006 with the of Riverside County Recorder.  The faulty Substitution attached hereto as Exhibit F is enclosed with Ms. Harris' letter attached hereto as *Exhibit K.*

164.  Plaintiff's point here is that in addition to their RESPA violations Defendants Chase Bank and Chase Home as the Servicers, Defendant JPM as the Beneficiary and Defendant Cal-Western as the Trustee violated California Civil Code §§ 2923.5 and 2924 in that a legally executed and recorded Assignment and Substitution was never recorded prior to Defendant Cal-Western using the valid and defective NOD attached hereto as *Exhibit I* to conduct the illegal foreclosure sale of Plaintiff's property.

165.  Furthermore, the Substitution attached hereto as *Exhibit E* was obviously tampered with in that while it was executed by Ms. Rosas on October 23, 2006, the Substitution was tampered with to show the *"effective 10/15/2006"* date, which is also the same *"effective 10/15/2006"* date reflected on the Substitution attached hereto as *Exhibit G* that is enclosed with Ms. Harris' letter

attached hereto as ***Exhibit K***.

166.   On October 27, 2006 Ms. Price executed the Assignment attached hereto as ***Exhibit F*** and on October 27, 2006, she executed the Substitution attached hereto as ***Exhibit G***, which shows Ms. Price's authority as Attorney-In-Fact for WM Specialty Mortgage LLC, without recourse by AMC.  The faulty Assignment and Substitution allegedly executed by Ms. Price during her employment with AMC wasn't executed in the presence of a licensed Notary, but were routed by AMC's "Foreclosure support mail documents team" to their Notary Department for notarization on October 27, 2006 by R.P. Umali at a location in Orange County California.

167.   Fraud or at least malfeasance is evident in that Ms. Price testified under oath on Pages 8-9 of her Deposition attached hereto as ***Exhibit H*** that she was employed as AMC's Foreclosure Supervisor from January 2006 through January 2007, however, she testified on Pages 14-15 of her Deposition that her job title as Vice President of AMC commenced on February 26, 2007.

168.   The Deposition of Ms. Price indicates AMC gave her signing authority of certain documents as Vice President "as of February 26, 2007" approximately four months after she executed the faulty Assignment and Substitution attached hereto as ***Exhibit F and G***, which she further testified on Pages 18-27 that she wasn't able to specifically identify the various documents presented throughout the day for her signature approval, and that on occasions the Notary (Larry Tolliver) did not see nor was he physically present in the same room when she affixed her signature to affidavits or other documents of various types.

169.   Ms. Price testified even further that she was uncertain if Mr. Tolliver's notary stamp was affixed the same day she executed documents as Vice President for AMC and that "The department that does the documents picks up the signed documents and then presents them to the Notaries", which fortifies Plaintiff's claim of fraud or at least malfeasance.

170.   Pursuant to RESPA and California Civil Code §§ 2923.5 and 2924 the conditions expressed in Plaintiff's Deed requires that according to Applicable Law a foreclosure sale cannot take place before the conditions are satisfied.  If Defendant JPM as the Beneficiary and Defendant Cal-Western as Trustee fails to carry out its obligations under the Deed a subsequent foreclosure sale is invalid. *Haywood Lumber & Investment Co. V. Corbett* (1934) 138 CA 644, 650, 33 P2d 41.

171. Defendant JPM never secured from Argent a legally executed Assignment prior to commencement of the foreclosure sale of Plaintiff's property, and Defendant JPM never executed or caused the required Assignment or Substitution to be recorded with the Recorder prior to recordation of the defective NOD or the NOT, therefore, Defendant JPM lack standing to employ or enter into a contractual relationship with its affiliates and associates Defendants Chase Home and Chase Bank as Servicers for the purpose to authorize Defendant Cal-Western as Trustee to conduct the illegal foreclosure sale of Plaintiff's property.

172. The Applicable Laws of this State holds that in a civil action involving a Deed with a power of sale an Assignee can only enforce the power of sale if the Assignment is recorded, since the Assignee's authority to conduct the foreclosure sale must appear in the public records. (*New York Life Insurance Co. V. Doane* (1936) 13 CA 2d. 233, 235-237, 56 P2d. 984, 56 ALR 224).

173. As a proximate result of the Defendants Chase Bank, Chase Home, JPM and Cal-Western violations stated herein Plaintiff has suffered injuries and harm and irreparable damages in an amount to be proven at trial but not less than the jurisdictional limits of this Court.

174. Wherefore Plaintiff requests relief as set forth below and herein.

**FIFTH CAUSE OF ACTION**
Misrepresentation

175. Plaintiff re-alleges and hereby incorporates by reference into this cause of action each and every preceding paragraph of this Complaint as though fully set forth herein at length.

176. It is evident that consistent with the OCC's Consent Order when Defendant Chase Bank's filed and recorded or caused to filed and recorded in State and Federal Courts and Recorder's offices various pleadings and affidavits executed by its "employees or employees of third-party service providers" who made assertions and false representations as to ownership of Plaintiff property as represented to Plaintiff by Defendant Coldwell Banker in their Notice Regarding Your Occupancy of the Property (This is Not a Notice to Vacate) dated February 7, 2011 that is attached hereto as *Exhibit S,* which indicates Defendant Chase Home "in its capacity as mortgage loan servicer and on behalf of the owner, completed a foreclosure proceeding", in addition, Defendant Coldwell Banker's Notice Regarding Your Occupancy of the Property (This is Not a Notice to Vacate) dated September 14, 2011 also attached hereto as *Exhibit S,* which reflects Defendant Chase Bank "in its capacity as

40

1    mortgage loan servicer and on behalf of the owner, completed a foreclosure proceeding" Plaintiff

2    relied upon these representation and believe them to be true at the time they were made.

3      177.  When Defendant Chase Bank and their "outside counsel and other third-party providers

4    handling foreclosure-related services" made assertions and representations to Plaintiff as to

5    Defendants JPM, Chase Bank and Chase Home's ownership of Plaintiff's Deed attached hereto as

6    *Exhibit C*, Defendants JPM, Chase Bank and Chase Home knew those representations were false

7    and that they lack standing to authorize Defendant Cal-Western to perform the illegal foreclosure

8    sale of Plaintiff's property under the defective NOD attached here to as *Exhibit I and J*.  In addition,

9    their assertions and representations as to the faulty Assignment attached hereto as *Exhibit D and F*

10    and the faulty Substitution attached hereto as *Exhibit G* and the NOT attached hereto as *Exhibit Q,*

11    Plaintiff relied upon these representation and believed them to be true at the time they were made.

12      178.  Plaintiff executed the Deed attached hereto as *Exhibit C* that is the same Deed enclosed

13    with Ms. Harris' letter that is attached hereto as *Exhibit K*, and as Plaintiff indicated commencing

14    with para. 42 the NOD attached hereto as *Exhibit J* that is the same NOD enclosed with Ms. Harris'

15    letter that is attached hereto as *Exhibit K*, which as Plaintiff mentioned the NOD was satisfied by

16    payment of World Savings Cashier/Teller's Check #2393741502 dated July 7, 2006 in the amount of

17    $18,914.23 and Patelco Credit Union Check #100452921 dated July 7, 2006 in the amount of

18    $2,774.78 that were made payable to AMC that are attached hereto as *Exhibit L*.

19      179.  Plaintiff reiterates here that the NOD attached hereto as *Exhibit J* that is the same NOD

20    enclosed with Ms. Harris' letter attached hereto as *Exhibit K* was voided out by payment of the two

21    Cashier's Checks attached hereto as *Exhibit L*, which to support Plaintiff's contention that the NOD

22    was rescinded and cancelled by recordation of the Rescission attached hereto as *Exhibit M.*  The

23    defective NOD attached hereto as *Exhibit I* was prematurely recorded on October 16, 2006

24    approximately two months prior to the recordation on December 6, 2006 of the required

25    Substitution.  Plaintiff point here is exactly which NOD did Defendant Cal-Western as Trustee use to

26    conduct the illegal foreclosure sale of Plaintiff's property on behalf of Defendants JPM as

27    Beneficiary and Chase Bank and Chase Home as Servicers?

28      180.  Furthermore, the Substitution attached hereto as *Exhibit E* was tampered with in that

while it was executed by Ms. Rosas on October 23, 2006, the Substitution was tampered with to show the *"effective 10/15/2006"* date, which is also the same *"effective 10/15/2006"* date reflected on the Substitution attached hereto as ***Exhibit G*** that is enclosed with Ms. Harris' letter attached hereto as ***Exhibit K***.

181. On October 27, 2006 Ms. Price executed the Assignment attached hereto as ***Exhibit F*** and on October 27, 2006, she executed the Substitution attached hereto as ***Exhibit G***, which shows Ms. Price's authority as Attorney-In-Fact for WM Specialty Mortgage LLC, without recourse by AMC. The faulty Assignment and Substitution allegedly executed by Ms. Price during her employment with AMC wasn't executed in the presence of a licensed Notary, but were routed by AMC's "Foreclosure support mail documents team" to their Notary Department for notarization on October 27, 2006 by R.P. Umali at a location in Orange County California.

182. Fraud or at least malfeasance is evident in that Ms. Price testified under oath on Pages 8-9 of her Deposition attached hereto as ***Exhibit H*** that she was employed as AMC's Foreclosure Supervisor from January 2006 through January 2007, however, she testified on Pages 14-15 of her Deposition that her job title as Vice President of AMC commenced on February 26, 2007.

183. The Deposition of Ms. Price indicates AMC gave her signing authority of certain documents as Vice President "as of February 26, 2007" approximately four months after she executed the faulty Assignment and Substitution attached hereto as ***Exhibit F and G***, which she further testified on Pages 18-27 that she wasn't able to specifically identify the various documents presented throughout the day for her signature approval, and that on occasions the Notary (Larry Tolliver) did not see nor was he physically present in the same room when she affixed her signature to affidavits or other documents of various types.

184. Defendant Chase Bank and Chase Home knew these assertion and representations were false, Defendants Chase Bank and Chase Home were sleeping in the same bed as Argent and AMC, nevertheless, for the purpose of inducing, confusing and fleecing Plaintiff of title to his property Defendants Chase Bank, Chase Home, JPM, Cal-Western, Coldwell Banker their Co-Defendants and each of them in their capacity made representations they knew or should have known were false with the intent to entrap Plaintiff to secure their profit and gain which therefore constitute

misrepresentation.

185.  Attached hereto as *Exhibit B* is Defendant JPM's Certificate Of No Record and according to the Certificate of Status (attached hereto as *Exhibit B*) as to Defendant Chase Home that was granted by the Court (see para. 7), it is evident this State's Secretary prohibit Defendants JPM and Chase Home from transacting intrastate business.

186.  For their violations as mentioned herein Plaintiff seeks to recover his monetary benefit compensation in the amount of $125,000.000 plus equity and other remedies from Defendants Chase Bank and Rust as described in Category 2 of the OCC and FRB's Framework.

187.  As a proximate result of the Defendants Chase Bank, Chase Home, JPM and Cal-Western, Coldwell Banker's misrepresentation Plaintiff has suffered injuries and harm and irreparable damages in an amount to be proven at trial.

188.  Wherefore plaintiff requests relief as set forth below and herein.

## SIXTH CAUSE OF ACTION
**Unfair Business Practices and Violation of Business and Professions Code §§ 17200-17210 ET SEQ.**

189.  Plaintiff re-alleges and hereby incorporates by reference into this cause of action each and every preceding paragraph of this Complaint as though fully set forth herein at length.

190.  Commencing February 4, 2011, and all relevant time stated herein Defendants Chase Bank, Chase Home, JPM, Cal-Western, Coldwell Banker and all of Defendant Chase Bank's "employees or employees of third-party service providers" made assertion, such as ownership of Plaintiff's Deed and filed and recorded or caused to filed and recorded in State and Federal Courts and Recorder's office affidavits, pleadings and mortgage-related and foreclosure-related documents, which Defendant Chase Bank knew was unfair business practices.

191.  As evidenced in the OCC's Consent Order Defendant Chase Bank' "employees or employees of third-party service providers" and their "outside counsel and other third-party providers handling foreclosure-related services" committed the acts described herein that constitute violations of Business and Professions Code §§ 17200-17210 in that Defendant Chase Bank's "employees or employees of third-party service providers" and their "outside counsel and other third-party providers handling foreclosure-related services" and each of them in their capacity through their Co-Defendants, beneficiary, servicer, agents, representatives, trustees, assignees,

43

predecessor, successor, servants, employer, employees or otherwise, and each of them have engaged in unfair business practices, causing Plaintiff to suffer injuries, harm and irreparable damages and inconveniences.

192.   These acts and practices, as described in the previous paragraphs and herein, violate Business and Professions Code § 17200 because their policies and practices violate California Civil Code § 1709, and consequently, constitute an unlawful business act of practice within the meaning of Business and Professions Code § 17200.

193.   The sufferings, harm, damages and inconveniences to Plaintiff and to members of the general public outweighs the utility of Defendants' policy and practices, consequently, constitute an unlawful business act of practice within the meaning of Business and Professions Code §17200.

194.   Further, the foregoing conduct threatens an incipient violation of a consumer law, including or violates the policy or spirit of such law or otherwise significantly threatens or harms competition.  Defendants Chase Bank, Chase Home, JPM, Cal-Western, Coldwell Banker and Defendant Chase Bank's "employees or employees of third-party service providers" and their "outside counsel and other third-party providers handling foreclosure-related services" and each of their practices are likely to mislead the general public, and therefore, constitute a fraudulent business act of practice within the meaning of Business and Professions Code § 17200.

195.   Defendants Chase Bank, Chase Home, JPM, Cal-Western, Coldwell Banker and Defendant Chase Bank's "employees or employees of third-party service providers" and their "outside counsel and other third-party providers handling foreclosure-related services" unfair, unlawful, and fraudulent business practices and false and misleading advertising present a continuing threat to members of public in that other consumers will be defrauded into closing on similar fraudulent loans and become victims of illegal foreclosure sale proceedings.  Plaintiff and other members of the general public have no other adequate remedy of law.

196.   As a proximate result to Defendant Chase Bank's "unsafe or unsound" banking and foreclosure sale practices and the continuing course of conduct by Defendant Chase Bank's "employees or employees of third-party service providers" and their "outside counsel and other third-party providers handling foreclosure-related services", Plaintiff has lost money and his

44

property and he has suffered injuries and harm and irreparable damages and inconveniences.

197.  Wherefore plaintiff requests relief as set forth below and herein.

### SEVENTH CAUSE OF ACTION
### Violation of California Corporation Code §§ 17050, 17051 and 17456

198.  Plaintiff re-alleges and hereby incorporates by reference into this cause of action each and every preceding paragraph of this Complaint as though fully set forth herein at length.

199.  The State of California and the Secretary requires that every operating LLC must be formed under the Beverly-Killea Limited Liability Company Act as described in California Corporation Code §§ 17050 and 17051 that states:

> "In order to form a limited liability company, one or more persons shall execute and file articles of organization with, and on a form prescribed by, the Secretary of State and, either before or after the filing of articles of organization, the members shall have entered into an operating agreement. *The existence of a limited liability company begins upon the filing of the articles of organization*. For all purposes, a copy of the articles of organization duly certified by the Secretary of State is conclusive evidence of the formation of a limited liability company and prima facie evidence of its existence."

> "The articles of organization shall set forth the name of the limited liability company. The following statement, the purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the Beverly-Killea Limited Liability Company Act."

200.  California Corporation Code § 17456 states in pertinent parts that a foreign limited liability company transacting intrastate business in this State shall not maintain any action, suit, or proceeding in any Court of this State until it has registered with the Secretary of this State.

201.  As a proximate result of Defendants JPM and Chase Home continuing course of conduct in that these Defendants illegally "transact intrastate business" in this State, Plaintiff and homeowners throughout this State have been victimize by Defendants JPM and Chase Home's illegal foreclosure-related practices. Defendants JPM and Chase Home as Defendant Chase Bank's affiliates and associates and third-party service providers made numerous assertions, such as Defendant JPM's assertion of ownership of Plaintiff's Deed.

202.  Attached hereto as *Exhibit B* is Defendant JPM's Certificate Of No Record and Defendant Chase Home' Certificate of Status that evidence the Secretary of this State prohibited

45

COMPLAINT FOR DAMAGES (VERIFIED)
Edward C. Tidwell v. JPMorgan Chase Bank, N.A., et al.

these Defendants from transacting intrastate business.

203.  As a direct and proximate result of Defendants Chase Bank and their third-party service providers' breach of the OCC's Consent Order and their violations of RESPA and Regulation X, in addition to their violation of California Civil Code §§ 2923.5 and 2924, Plaintiff has suffered injuries, harm and irreparable damages.

204.  Wherefore plaintiff requests relief as set forth below and herein.

## EIGHTH CAUSE OF ACTION
### Declaratory Relief

205.  Plaintiff re-alleges and hereby incorporates by reference into this cause of action each and every preceding paragraph of this Complaint as though fully set forth herein at length.

206.  The Deed is a Security Instrument and a contract that was executed together with the Promissory Note and all Riders by Plaintiff as the Borrower on August 2, 2005, Plaintiff promised to pay Argent the Beneficiary with power of sale under the Deed regular periodic payments until the debt was satisfied not later than September 1, 2035.

207.  For the sole purpose to secure their interest Argent drafted the Deed that created the contractual relationship with Plaintiff that he had no prior knowledge or part in drafting, Plaintiff contends that the aforementioned language contained in the Deed creates a contractual relationship and conditions precedent prior to commencement of the illegal foreclosure sale of Plaintiff's property without first giving written notice to RESPA 12 U.S.C. § 2601 et seq. and its implementing regulation, Regulation X 24 C.F.R. Part 3500 or any additional or successor legislation or regulation that govern matters under the Deed.

208.  As reflected in the Deed attached hereto as *Exhibit C* and NOD attached hereto as *Exhibit J,* the Deed and NOD is enclosed with Ms. Harris' letter attached hereto as *Exhibit K*, which shows TCT as the Trustee for Argent and AMC is reflected on the NOD as Argent's Servicer.  In addition to Defendant JPM as the Beneficiary, and Defendants Chase Bank and Chase Home as Servicer and Defendant Cal-Western as Trustee violations of RESPA and Regulation X, Defendants violated California Civil Code §§ 2923.5 and 2924 in that the arrears in the amount of $15,444.97 as of May 4, 2006 as shown on the NOD was satisfied by payment in full to AMC by World Savings Cashier/Teller's Check #2393741502 dated July 7, 2006 in the amount of $18,914.23 and Patelco

Credit Union Check #100452921 dated July 7, 2006 in the amount of $2,774.78 that are attached hereto as **Exhibit L**. TCT as Trustee for Argent caused the Rescission attached hereto as **Exhibit M** to be recorded with the Recorder on July 20, 2006 to rescind and cancel the NOD.

209. The NOD attached hereto as **Exhibit I** is defective in that it was prematurely recorded on October 16, 2006 approximately two months prior to recordation on December 6, 2006 of the Assignment and Substitution attached respectively hereto as **Exhibit F and G**, which Defendants JPM as the Beneficiary, Chase Bank and Chase Home as the Servicers and Cal-Western used to conduct the illegal foreclosure sale of Plaintiff's property.

210. Defendants JPM, Chase Bank and Chase Home lack standing to authorize Defendant Cal-Western to perform as Trustee in that Argent never granted, assigned or transferred all of its beneficial interest under the Deed with power of sale to Defendant JPM, and, therefore, Defendants JPM as Beneficiary, Chase Bank and Chase Home as Servicers never had legal authority to enter into a contractual relationship with Defendant Cal-Western as Trustee on behalf of Defendant JPM.

211. In addition to their RESPA violations Defendants Chase Bank and Chase Home as the Servicers, Defendant JPM as the Beneficiary and Defendant Cal-Western as the Trustee violated California Civil Code §§ 2923.5 and 2924 in that a legally executed and recorded Assignment and Substitution was never recorded prior to Defendant Cal-Western using the defective NOD attached hereto as **Exhibit I** to conduct the illegal foreclosure sale.

212. The Substitution attached hereto as **Exhibit E** was obviously tampered with in that while it was executed by Ms. Rosas on October 23, 2006, the Substitution shows the **"effective 10/15/2006"** date, which is also the same **"effective 10/15/2006"** date reflected on the Substitution attached hereto as **Exhibit G** that is enclosed with Ms. Harris' letter attached hereto as **Exhibit K**. Additionally, the **"effective 10/15/2006"** date is reflected on the Assignment attached hereto as **Exhibit F**, which fortifies Plaintiff's contentions that are consistent with the OCC's Consent Order that states Defendant Chase Bank and its third-party providers handling foreclosure-related services filed and recorded or caused to filed and recorded in State and Federal Courts and Recorder offices fraudulent documents solely for the purpose to steal Plaintiff's property.

213. Commencing with para. 42 above on May 8, 2006, Ms. Rosas as Authorized Agent for

47

Argent by AMC executed the Assignment attached hereto as *Exhibit D* that is enclosed with Ms. Harris' letter attached hereto as *Exhibit K*, and on October 23, 2006, she executed the Substitution attached hereto as *Exhibit E* as Authorized Agent for Deutsche Bank National Trust Company, however, three days later on October 27, 2006, Ms. Rosas as Authorized Agent for Argent by AMC together with Ms. Price executed the Assignment attached hereto as *Exhibit F,* and Ms. Price alone executed the Substitution attached hereto as *Exhibit G* on October 27, 2006.

214. Plaintiff's point her is that there is no actual controversy, it is undisputed and the facts are obvious in that fraud or at least malfeasance is evident since Ms. Price testified under oath on Pages 8-9 of her Deposition attached hereto as *Exhibit H* that she was employed as AMC's Foreclosure Supervisor from January 2006 through January 2007, however, Ms. Price testified on Pages 14-15 of her Deposition that her job title as Vice President of AMC commenced on February 26, 2007.

215. The Deposition of Ms. Price indicates AMC gave her signing authority of certain documents as Vice President "as of February 26, 2007" approximately four months after she executed the faulty Assignment and Substitution attached hereto as *Exhibit F and G*, which she further testified on Pages 18-27 that she wasn't able to specifically identify the various documents presented throughout the day for her signature approval, and that on occasions the Notary (Larry Tolliver) did not see nor was he physically present in the same room when she affixed her signature to affidavits or other documents of various types.

216. Ms. Price testified she was uncertain if Mr. Tolliver's notary stamp was affixed the same day she executed documents as Vice President for AMC and that "The department that does the documents picks up the signed documents and then presents them to the Notaries", which consistent with the OCC's Consent Order Defendant Chase Bank and its third-party providers handling foreclosure-related services filed and recorded or caused to filed and recorded in State and Federal Courts and Recorder offices fraudulent documents for the purpose to claim ownership of Plaintiff Deed and title to his property.

217. Pursuant to RESPA and California Civil Code §§ 2923.5 and 2924 the conditions expressed in Plaintiff's Deed requires that according to Applicable Law a foreclosure sale cannot take place before the conditions are satisfied, which Defendant JPM as the Beneficiary breached in

48

COMPLAINT FOR DAMAGES (VERIFIED)
Edward C. Tidwell v. JPMorgan Chase Bank, N.A., et al.

that Argent never legally granted, assigned or transferred all of its beneficial interest under the Deed

with power of sale to Defendant JPM, therefore, the Trustee's Deed Upon Sale attached hereto as

***Exhibit O*** that is enclosed with Ms. Harris' letter attached hereto as ***Exhibit K*** is void and

unenforceable against Plaintiff's property.

218.  Plaintiff request that the Court take judicial notice of undisputed facts provided hereto,

and that he move the Court for Summary Judgment and an Order compelling Defendants JPM,

Chase Bank, Chase Home and Cal-Western to produce the original Deed together with Promissory

Note and Riders that is essential to determine the actual status and validity of the Deed, Promissory

Note and Riders to identify the actual Lender, Originator, Beneficiary and Trustee.

219.  Plaintiff request a judicial and he is entitled to determination under the appropriate laws

of this State as to his rights, obligations and a declaration as to the authenticity of the Deed,

Promissory Note, Riders and the NODs, Assignments, Substitution and NOT.

220.  Wherefore plaintiff requests relief as set forth below and herein.

## NINETH CAUSE OF ACTION
### Injunctive Relief

221.  Plaintiff re-alleges and hereby incorporates by reference into this cause of action each

and every preceding paragraph of this Complaint as though fully set forth herein at length.

222.  Plaintiff is not able to actually state whose name is on the Deed and Note, therefore,

Plaintiff move this Court pursuant to Rule 65 of the Federal Rules of Civil Procedure ("FRCP") for

Preliminary Injunction against Defendants Chase Bank, Chase Home, JPM and Cal-Western to

determine their status as real parties in interest with legal rights to Plaintiff's Deed.

223.  Plaintiff is entitled to an injunction against Defendants Chase Bank, Chase Home, JPM

and Cal-Western enjoining and prohibiting them from pursuing any further acts or proceedings

against the Roundup Way property, including but not limited to the sell, granting, assigning and

transferring title or the Deed or doing any such that would negate the effect and purpose of such an

injunction or otherwise operate in derogation of the Court's jurisdiction during the pendency of this

action.  Plaintiff states as follows:

> a.  Plaintiff will suffer injury, harm and irreparable damages if Defendants
>     Chase Bank, Chase Home, JPM and Cal-Western convey, grant, assign,

transfer, sell, list on the real estate market, evict or encumber any interest to Plaintiff's property;

b.   Plaintiff have no adequate remedy at law should Defendants Chase Bank, Chase Home and JPM and each of them convey, grant, assign, transfer, sale, list on the real estate market for sell, evict or encumber any interest to Plaintiff's property;

c.   Plaintiff is likely to prevail on the merits of his claims specifically since Defendant Chase Bank breach the OCC's Consent Order and the Stipulation and Order, and further Defendant Chase Home was never unauthorized by the Secretary to "transact intrastate business" in this State; and

d.   It is evident the balance of hardship tips decidedly in favor of granting the requested injunction, inasmuch as the cost to Defendants Chase Bank, Chase Home and JPM and each of them of enjoining any such transfer enjoining any such transfer negligible when compared to the potential permanent harm Plaintiff face if he loses title to his property prior to these proceedings ending.

224.   Unless Defendants Chase Bank, Chase Home and JPM are enjoined from doing the things aforesaid, Plaintiff will sustain further injuries, harm and irreparable damages if the Roundup Way property is sold or if he is evicted.

225.   Defendant Chase Bank accumulated massive resources and financial gain as a direct result of their "unsafe or unsound banking" and illegal foreclosure sale practices, which during the housing crisis, a substantially large number of residential mortgage loan serviced by Defendants Chase Bank and Chase Home became delinquent and resulted in foreclosure actions.  As indicated in the OCC's Consent Order, Defendant Chase Bank's foreclosure inventory grew substantially from January 2008 through December 2010.

226.   Defendant Chase Bank is among the largest servicers of residential mortgages with a portfolio of 6,300,000 residential mortgage loans, it is undisputed that the OCC's national bank examiners have already confirmed these findings.

227.   It is apparent that the balance of hardships tips sharply in Plaintiff's favor as opposed to Defendants Chase Bank and Chase Home, specifically since Defendant Chase Home according to the Certificate of Status (attached hereto as ***Exhibit B***) that was granted by the Court (see para. 7) evidence Defendant Chase Home illegally transacted intrastate business.  Defendants Chase Bank and Chase Home have no basis to assert that they would be injured if the injunction is granted, Defendant Chase Home has made millions of dollars illegally foreclosing on Plaintiff and hundreds of other California homeowners' property.

50

228.  As a direct and proximate result of Defendants Chase Bank and Chase Home's breach of the OCC's Consent Order and their violations of Section 6 of RESPA and Regulation X, their violation of California Civil Code §§ 2923.5, 2923.52-55 and 2924, Defendant Chase Home's violation of California Corporation Code §§ 17050, 17051 and 17456, and their violation of California Penal Code § 115, Plaintiff has suffered injuries, harm and irreparable damages.

229.  Wherefore plaintiff requests relief as set forth below and herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief, and demand that judgment be rendered against Defendants and each of them, as follows:

1.  For general and special damages in the sum of Thirty Five Million Dollars ($35,000,000.00);

2.  For Compensatory, Punitive and Exemplary damages in the sum of One Hundred Fifty Million Dollars ($150,000,000.00) to punish Defendants and deter others from engaging in similar misconduct;

3.  For an Order that Defendants produce the original Deed, Note, TILA and Loan Application; a legally executed and recorded certified copy of the Assignment, Substitution, NOD and NOT, and a fully executed copy of Plaintiff's IRS Form 1040 for the tax year 2003 and 2004;

4.  For the issuance of a Preliminary and Permanent Injunction, Restraining Order against Defendants ordering the rescission and cancellation of the Trustee's Deed of Sale and prohibiting them from listing on the real estate market for sell and pursuing any unlawful detainer-eviction proceedings of Plaintiff from the Roundup Way property, and from doing any other acts, which would negate the effect and purpose of an Injunction or otherwise operate in derogation of the Court's jurisdiction over this matter, during the pendency of this action;

5.  For damages for Fraud and Deceit;

6.  For damages for Negligence;

7.  For damages for Misrepresentation;

8.  For costs of suit herein, including attorney's fees in the event that counsel is retained as permitted by law; and

9.  For such other relief according to proof at the time of trial as the Court deems just and proper.

Dated:  June ___7___, 2013

_Edward C. Tidwell_
Edward C. Tidwell

51

**<u>VERIFICATION</u>**

I, Edward C. Tidwell, declare that I am the plaintiff in this matter.  I have read the foregoing Complaint and know the contents thereof to be true and correct of my own personal knowledge, except as to those matter stated therein upon information and belief, in which case I believe them to be true and correct to the best of my knowledge and are based either on my personal knowledge or knowledge that I have obtained through other sources and I reasonable believe those items to be true.

I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct and that this verification was executed on the ____7TH____day of June 2013, in the City of Antioch, Contra Costa County.

_Edward C. Tidwell_

Edward C. Tidwell

52

COMPLAINT FOR DAMAGES (VERIFIED)
Edward C. Tidwell v. JPMorgan Chase Bank, N.A., et al.

# EXHIBIT

# A

# EXHIBIT A

**The OCC's Consent Order**

**Edward C. Tidwell vs. JPMorgan Chase Bank, N.A., et al.**
**United States District Court, Northern District of California**

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| **In the Matter of:** )<br><br>JPMorgan Chase Bank, N.A. )<br>New York, NY ) | AA-EC-11-15 |

**CONSENT ORDER**

The Comptroller of the Currency of the United States of America ("Comptroller"),

through his national bank examiners and other staff of the Office of the Comptroller of the

Currency ("OCC"), as part of an interagency horizontal review of major residential mortgage

servicers, has conducted an examination of the residential real estate mortgage foreclosure

processes of JPMorgan Chase Bank, N.A., New York, New York ("Bank").  The OCC has

identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing

and in the Bank's initiation and handling of foreclosure proceedings.  The OCC has informed the

Bank of the findings resulting from the examination.

The Bank, by and through its duly elected and acting Board of Directors ("Board"), has

executed a "Stipulation and Consent to the Issuance of a Consent Order," dated April 13, 2011

("Stipulation and Consent"), that is accepted by the Comptroller.  By this Stipulation and

Consent, which is incorporated by reference, the Bank has consented to the issuance of this

Consent Cease and Desist Order ("Order") by the Comptroller.  The Bank has committed to

taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound

practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and

foreclosure processes.  The Bank has begun implementing procedures to remediate the practices
addressed in this Order.

## ARTICLE I

## COMPTROLLER'S FINDINGS

The Comptroller finds, and the Bank neither admits nor denies, the following:

(1)  The Bank is among the largest servicers of residential mortgages in the United States,
and services a portfolio of 6,300,000 residential mortgage loans.  During the recent housing
crisis, a substantially large number of residential mortgage loans serviced by the Bank became
delinquent and resulted in foreclosure actions.  The Bank's foreclosure inventory grew
substantially from 2008 through 2010.

(2)  In connection with certain foreclosures of loans in its residential mortgage servicing
portfolio, the Bank:

(a)  filed or caused to be filed in state and federal courts affidavits executed by its
employees or employees of third-party service providers making various assertions, such as
ownership of the mortgage note and mortgage, the amount of the principal and interest due, and
the fees and expenses chargeable to the borrower, in which the affiant represented that the
assertions in the affidavit were made based on personal knowledge or based on a review by the
affiant of the relevant books and records, when, in many cases, they were not based on such
personal knowledge or review of the relevant books and records;

(b)  filed or caused to be filed in state and federal courts, or in local land records
offices, numerous affidavits or other mortgage-related documents that were not properly
notarized, including those not signed or affirmed in the presence of a notary;

2

(c)  litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time;

(d)  failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes;

(e)  failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and

(f)  failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.

(3)  By reason of the conduct set forth above, the Bank engaged in unsafe or unsound banking practices.

Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. §1818(b), the Comptroller hereby ORDERS that:

ARTICLE II

COMPLIANCE COMMITTEE

(1)  The Board shall maintain a Compliance Committee of at least three (3) directors, of which at least two (2) may not be employees or officers of the Bank or any of its subsidiaries or affiliates.  In the event of a change of the membership, the name of any new member shall be submitted to the Examiner-in-Charge for Large Bank Supervision at the Bank ("Examiner-in-Charge").  The Compliance Committee shall be responsible for monitoring and coordinating the

3

Bank's compliance with the provisions of this Order.  The Compliance Committee shall meet at

least monthly and maintain minutes of its meetings.

(2)  Within ninety (90) days of this Order, and within thirty (30) days after the end of

each quarter thereafter, the Compliance Committee shall submit a written progress report to the

Board setting forth in detail actions taken to comply with each Article of this order, and the

results and status of those actions.

(3)  The Board shall forward a copy of the Compliance Committee's report, with any

additional comments by the Board, to the Deputy Comptroller for Large Bank Supervision

("Deputy Comptroller") and the Examiner-in-Charge within ten (10) days of receiving such

report.


ARTICLE III

COMPREHENSIVE ACTION PLAN

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy

Comptroller and the Examiner-in-Charge an acceptable plan containing a complete description

of the actions that are necessary and appropriate to achieve compliance with Articles IV through

XII of this Order ("Action Plan").  In the event the Deputy Comptroller asks the Bank to revise

the Action Plan, the Bank shall promptly make the requested revisions and resubmit the Action

Plan to the Deputy Comptroller and the Examiner-in-Charge.  Following acceptance of the

Action Plan by the Deputy Comptroller, the Bank shall not take any action that would constitute

a significant deviation from, or material change to, the requirements of the Action Plan or this

Order, unless and until the Bank has received a prior written determination of no supervisory

objection from the Deputy Comptroller.

(2)  The Board shall ensure that the Bank achieves and thereafter maintains compliance with this Order, including, without limitation, successful implementation of the Action Plan. The Board shall further ensure that, upon implementation of the Action Plan, the Bank achieves and maintains effective mortgage servicing, foreclosure, and loss mitigation activities (as used herein, the phrase "loss mitigation" shall include, but not be limited to, activities related to special forbearances, modifications, short refinances, short sales, cash-for-keys, and deeds-in-lieu of foreclosure and be referred to as either "Loss Mitigation" or "Loss Mitigation Activities"), as well as associated risk management, compliance, quality control, audit, training, staffing, and related functions.  In order to comply with these requirements, the Board shall:

(a)  require the timely reporting by Bank management of such actions directed by the Board to be taken under this Order;

(b)  follow-up on any non-compliance with such actions in a timely and appropriate manner; and

(c)  require corrective action be taken in a timely manner for any non-compliance with such actions.

(3)  The Action Plan shall address, at a minimum:

(a)  financial resources to develop and implement an adequate infrastructure to support existing and/or future Loss Mitigation and foreclosure activities and ensure compliance with this Order;

(b)  organizational structure, managerial resources, and staffing to support existing and/or future Loss Mitigation and foreclosure activities and ensure compliance with this Order;

5

(c)  metrics to measure and ensure the adequacy of staffing levels relative to existing and/or future Loss Mitigation and foreclosure activities, such as limits for the number of loans assigned to a Loss Mitigation employee, including the single point of contact as hereinafter defined, and deadlines to review loan modification documentation, make loan modification decisions, and provide responses to borrowers;

(d)  governance and controls to ensure compliance with all applicable federal and state laws (including the U.S. Bankruptcy Code and the Servicemembers Civil Relief Act ("SCRA")), rules, regulations, and court orders and requirements, as well as the Membership Rules of MERSCORP, servicing guides of the Government Sponsored Enterprises ("GSEs") or investors, including those with the Federal Housing Administration and those required by the Home Affordable Modification Program ("HAMP"), and loss share agreements with the Federal Deposit Insurance Corporation (collectively "Legal Requirements"), and the requirements of this Order.

(4)  The Action Plan shall specify timelines for completion of each of the requirements of Articles IV through XII of this Order.  The timelines in the Action Plan shall be consistent with any deadlines set forth in this Order.

ARTICLE IV

COMPLIANCE PROGRAM

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable compliance program to ensure that the mortgage servicing and foreclosure operations, including Loss Mitigation and loan modification, comply with all applicable Legal Requirements, OCC supervisory guidance, and the

6

requirements of this Order and are conducted in a safe and sound manner ("Compliance Program"). The Compliance Program shall be implemented within one hundred twenty (120) days of this Order. Any corrective action timeframe in the Compliance Program that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge. The Compliance Program shall include, at a minimum:

(a)  appropriate written policies and procedures to conduct, oversee, and monitor mortgage servicing, Loss Mitigation, and foreclosure operations;

(b)  processes to ensure that all factual assertions made in pleadings, declarations, affidavits, or other sworn statements filed by or on behalf of the Bank are accurate, complete, and reliable; and that affidavits and declarations are based on personal knowledge or a review of the Bank's books and records when the affidavit or declaration so states;

(c)  processes to ensure that affidavits filed in foreclosure proceedings are executed and notarized in accordance with state legal requirements and applicable guidelines, including jurat requirements;

(d)  processes to review and approve standardized affidavits and declarations for each jurisdiction in which the Bank files foreclosure actions to ensure compliance with applicable laws, rules and court procedures;

(e)  processes to ensure that the Bank has properly documented ownership of the promissory note and mortgage (or deed of trust) under applicable state law, or is otherwise a proper party to the action (as a result of agency or other similar status) at all stages of foreclosure and bankruptcy litigation, including appropriate transfer and delivery of endorsed notes and assigned mortgages or deeds of trust at the formation of a residential mortgage-backed security,

and lawful and verifiable endorsement and successive assignment of the note and mortgage or deed of trust to reflect all changes of ownership;

(f)  processes to ensure that a clear and auditable trail exists for all factual information contained in each affidavit or declaration, in support of each of the charges that are listed, including whether the amount is chargeable to the borrower and/or claimable by the investor;

(g)  processes to ensure that foreclosure sales (including the calculation of the default period, the amounts due, and compliance with notice requirements) and post-sale confirmations are in accordance with the terms of the mortgage loan and applicable state and federal law requirements;

(h)  processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage note, mortgage, or other customer authorization with respect to the imposition of fees, charges, and expenses, and in compliance with all applicable Legal Requirements and OCC supervisory guidance;

(i)  processes to ensure that the Bank has the ability to locate and secure all documents, including the original promissory notes if required, necessary to perform mortgage servicing, foreclosure and Loss Mitigation, or loan modification functions;

(j)  ongoing testing for compliance with applicable Legal Requirements and OCC supervisory guidance that is completed by qualified persons with requisite knowledge and ability (which may include internal audit) who are independent of the Bank's business lines;

(k)  measures to ensure that policies, procedures, and processes are updated on an ongoing basis as necessary to incorporate any changes in applicable Legal Requirements and OCC supervisory guidance;

(l)  processes to ensure the qualifications of current management and supervisory personnel responsible for mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation and loan modification, are appropriate and a determination of whether any staffing changes or additions are needed;

(m)  processes to ensure that staffing levels devoted to mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation, and loan modification, are adequate to meet current and expected workload demands;

(n)  processes to ensure that workloads of mortgage servicing, foreclosure and Loss Mitigation, and loan modification personnel, including single point of contact personnel as hereinafter defined, are reviewed and managed.  Such processes, at a minimum, shall assess whether the workload levels are appropriate to ensure compliance with the requirements of Article IX of this Order, and necessary adjustments to workloads shall promptly follow the completion of the reviews.  An initial review shall be completed within ninety (90) days of this Order, and subsequent reviews shall be conducted semi-annually;

(o)  processes to ensure that the risk management, quality control, audit, and compliance programs have the requisite authority and status within the organization so that appropriate reviews of the Bank's mortgage servicing, Loss Mitigation, and foreclosure activities and operations may occur and deficiencies are identified and promptly remedied;

(p)  appropriate training programs for personnel involved in mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation, and loan modification, to ensure compliance with applicable Legal Requirements and supervisory guidance; and

(q)  appropriate procedures for customers in bankruptcy, including a prohibition on collection of fees in violation of bankruptcy's automatic stay (11 U.S.C. § 362), the discharge injunction (11 U.S.C. § 524), or any applicable court order.

ARTICLE V

THIRD PARTY MANAGEMENT

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge acceptable policies and procedures for outsourcing foreclosure or related functions, including Loss Mitigation and loan modification, and property management functions for residential real estate acquired through or in lieu of foreclosure, to any agent, independent contractor, consulting firm, law firm (including local counsel in foreclosure or bankruptcy proceedings retained to represent the interests of the owners of mortgages), property management firm, or other third-party (including any affiliate of the Bank) ("Third-Party Providers").  Third-party management policies and procedures shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timetable that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge.  The policies and procedures shall include, at a minimum:

(a)  appropriate oversight to ensure that Third-Party Providers comply with all applicable Legal Requirements, OCC supervisory guidance (including applicable portions of OCC Bulletin 2001-47), and the Bank's policies and procedures;

(b)  measures to ensure that all original records transferred from the Bank to Third-Party Providers (including the originals of promissory notes and mortgage documents) remain within the custody and control of the Third-Party Provider (unless filed with the

10

appropriate court or the loan is otherwise transferred to another party), and are returned to the Bank or designated custodians at the conclusion of the performed service, along with all other documents necessary for the Bank's files, and that the Bank retains imaged copies of significant documents sent to Third-Party Providers;

(c) measures to ensure the accuracy of all documents filed or otherwise utilized on behalf of the Bank or the owners of mortgages in any judicial or non-judicial foreclosure proceeding, related bankruptcy proceeding, or in other foreclosure-related litigation, including, but not limited to, documentation sufficient to establish ownership of the promissory note and/or right to foreclose at the time the foreclosure action is commenced;

(d) processes to perform appropriate due diligence on potential and current Third-Party Provider qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability, and to ensure adequacy of Third-Party Provider staffing levels, training, work quality, and workload balance;

(e) processes to ensure that contracts provide for adequate oversight, including requiring Third-Party Provider adherence to Bank foreclosure processing standards, measures to enforce Third-Party Provider contractual obligations, and processes to ensure timely action with respect to Third-Party Provider performance failures;

(f) processes to ensure periodic reviews of Third-Party Provider work for timeliness, competence, completeness, and compliance with all applicable Legal Requirements and supervisory guidance, and to ensure that foreclosures are conducted in a safe and sound manner;

(g) processes to review customer complaints about Third-Party Provider services;

11

(h)  processes to prepare contingency and business continuity plans that ensure the continuing availability of critical third-party services and business continuity of the Bank, consistent with federal banking agency guidance, both to address short-term and long-term service disruptions and to ensure an orderly transition to new service providers should that become necessary;

(i)  a review of fee structures for Third-Party Providers to ensure that the method of compensation considers the accuracy, completeness, and legal compliance of foreclosure filings and is not based solely on increased foreclosure volume and/or meeting processing timelines; and

(j)  a certification process for law firms (and recertification of existing law firm providers) that provide residential mortgage foreclosure and bankruptcy services for the Bank, on a periodic basis, as qualified to serve as Third-Party Providers to the Bank including that attorneys are licensed to practice in the relevant jurisdiction and have the experience and competence necessary to perform the services requested.


ARTICLE VI

MORTGAGE ELECTRONIC REGISTRATION SYSTEM

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan to ensure appropriate controls and oversight of the Bank's activities with respect to the Mortgage Electronic Registration System ("MERS") and compliance with MERSCORP's membership rules, terms, and conditions ("MERS Requirements") ("MERS Plan").  The MERS Plan shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timetable that is in excess of one

hundred twenty (120) days must be approved by the Examiner-in-Charge. The MERS Plan shall include, at a minimum:

(a) processes to ensure that all mortgage assignments and endorsements with respect to mortgage loans serviced or owned by the Bank out of MERS' name are executed only by a certifying officer authorized by MERS and approved by the Bank;

(b) processes to ensure that all other actions that may be taken by MERS certifying officers (with respect to mortgage loans serviced or owned by the Bank) are executed by a certifying officer authorized by MERS and approved by the Bank;

(c) processes to ensure that the Bank maintains up-to-date corporate resolutions from MERS for all Bank employees and third-parties who are certifying officers authorized by MERS, and up-to-date lists of MERS certifying officers;

(d) processes to ensure compliance with all MERS Requirements and with the requirements of the MERS Corporate Resolution Management System ("CRMS");

(e) processes to ensure the accuracy and reliability of data reported to MERSCORP, including monthly system-to-system reconciliations for all MERS mandatory reporting fields, and daily capture of all rejects/warnings reports associated with registrations, transfers, and status updates on open-item aging reports. Unresolved items must be maintained on open-item aging reports and tracked until resolution. The Bank shall determine and report whether the foreclosures for loans serviced by the Bank that are currently pending in MERS' name are accurate and how many are listed in error, and describe how and by when the data on the MERSCORP system will be corrected; and

(f) an appropriate MERS quality assurance workplan, which clearly describes all tests, test frequency, sampling methods, responsible parties, and the expected process for open-

item follow-up, and includes an annual independent test of the control structure of the system-to-system reconciliation process, the reject/warning error correction process, and adherence to the Bank's MERS Plan.

(2)  The Bank shall include MERS and MERSCORP in its third-party vendor management process, which shall include a detailed analysis of potential vulnerabilities, including information security, business continuity, and vendor viability assessments.

ARTICLE VII

<u>FORECLOSURE REVIEW</u>

(1)  Within forty-five (45) days of this Order, the Bank shall retain an independent consultant acceptable to the Deputy Comptroller and the Examiner-in-Charge to conduct an independent review of certain residential foreclosure actions regarding individual borrowers with respect to the Bank's mortgage servicing portfolio.  The review shall include residential foreclosure actions or proceedings (including foreclosures that were in process or completed) for loans serviced by the Bank, whether brought in the name of the Bank, the investor, the mortgage note holder, or any agent for the mortgage note holder (including MERS), that have been pending at any time from January 1, 2009 to December 31, 2010, as well as residential foreclosure sales that occurred during this time period ("Foreclosure Review").

(2)  Within fifteen (15) days of the engagement of the independent consultant described in this Article, but prior to the commencement of the Foreclosure Review, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge for approval an engagement letter that sets forth:

14

(a)  the methodology for conducting the Foreclosure Review, including: (i) a description of the information systems and documents to be reviewed, including the selection of criteria for cases to be reviewed; (ii) the criteria for evaluating the reasonableness of fees and penalties; (iii) other procedures necessary to make the required determinations (such as through interviews of employees and third parties and a process for submission and review of borrower claims and complaints); and (iv) any proposed sampling techniques.  In setting the scope and review methodology under clause (i) of this sub-paragraph, the independent consultant may consider any work already done by the Bank or other third-parties on behalf of the Bank.  The engagement letter shall contain a full description of the statistical basis for the sampling methods chosen, as well as procedures to increase the size of the sample depending on results of the initial sampling;

(b)  expertise and resources to be dedicated to the Foreclosure Review;

(c)  completion of the Foreclosure Review within one hundred twenty (120) days from approval of the engagement letter; and

(d) a written commitment that any workpapers associated with the Foreclosure Review shall be made available to the OCC immediately upon request.

(3)  The purpose of the Foreclosure Review shall be to determine, at a minimum:

(a)  whether at the time the foreclosure action was initiated or the pleading or affidavit filed (including in bankruptcy proceedings and in defending suits brought by borrowers), the foreclosing party or agent of the party had properly documented ownership of the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a proper party to the action as a result of agency or similar status;

(b)   whether the foreclosure was in accordance with applicable state and federal law, including but not limited to the SCRA and the U.S. Bankruptcy Code;

(c)   whether a foreclosure sale occurred when an application for a loan modification or other Loss Mitigation was under consideration; when the loan was performing in accordance with a trial or permanent loan modification; or when the loan had not been in default for a sufficient period of time to authorize foreclosure pursuant to the terms of the mortgage loan documents and related agreements;

(d)   whether, with respect to non-judicial foreclosures, the procedures followed with respect to the foreclosure sale (including the calculation of the default period, the amounts due, and compliance with notice periods) and post-sale confirmations were in accordance with the terms of the mortgage loan and state law requirements;

(e)   whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary;

(f)   whether the frequency that fees were assessed to any delinquent borrower's account (including broker price opinions) was excessive under the terms of the borrower's loan documents, and applicable state and federal law;

(g)   whether Loss Mitigation Activities with respect to foreclosed loans were handled in accordance with the requirements of the HAMP, and consistent with the policies and procedures applicable to the Bank's proprietary loan modifications or other loss mitigation programs, such that each borrower had an adequate opportunity to apply for a Loss Mitigation option or program, any such application was handled properly, a final decision was made on a reasonable basis, and was communicated to the borrower before the foreclosure sale; and

16

(h) whether any errors, misrepresentations, or other deficiencies identified in the Foreclosure Review resulted in financial injury to the borrower or the mortgagee.

(4) The independent consultant shall prepare a written report detailing the findings of the Foreclosure Review ("Foreclosure Report"), which shall be completed within thirty (30) days of completion of the Foreclosure Review. Immediately upon completion, the Foreclosure Report shall be submitted to the Deputy Comptroller, Examiner-in-Charge, and the Board.

(5) Within forty-five (45) days of submission of the Foreclosure Report to the Deputy Comptroller, Examiner-in-Charge, and the Board, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge a plan, acceptable to the OCC, to remediate all financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies identified in the Foreclosure Report, by:

(a) reimbursing or otherwise appropriately remediating borrowers for impermissible or excessive penalties, fees, or expenses, or for other financial injury identified in accordance with this Article; and

(b) taking appropriate steps to remediate any foreclosure sale where the foreclosure was not authorized as described in this Article.

(6) Within sixty (60) days after the OCC provides supervisory non-objection to the plan set forth in paragraph (5) above, the Bank shall make all reimbursement and remediation payments and provide all credits required by such plan, and provide the OCC with a report detailing such payments and credits.

## ARTICLE VIII

### MANAGEMENT INFORMATION SYSTEMS

(1) Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan for operation of its management information systems ("MIS") for foreclosure and Loss Mitigation or loan modification activities to ensure the timely delivery of complete and accurate information to permit effective decision-making. The MIS plan shall be implemented within one hundred twenty (120) days of this Order. Any corrective action timeframe that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge. The plan shall include, at a minimum:

(a) a description of the various components of MIS used by the Bank for foreclosure and Loss Mitigation or loan modification activities;

(b) a description of and timetable for any needed changes or upgrades to:

(i) monitor compliance with all applicable Legal Requirements and supervisory guidance, and the requirements of this Order;

(ii) ensure the ongoing accuracy of records for all serviced mortgages, including, but not limited to, records necessary to establish ownership and the right to foreclose by the appropriate party for all serviced mortgages, outstanding balances, and fees assessed to the borrower; and

(iii) measures to ensure that Loss Mitigation, loan foreclosure, and modification staffs have sufficient and timely access to information provided by the borrower regarding loan foreclosure and modification activities;

18

(c)  testing the integrity and accuracy of the new or enhanced MIS to ensure that reports generated by the system provide necessary information for adequate monitoring and quality controls.

## ARTICLE IX

### MORTGAGE SERVICING

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan, along with a timeline for ensuring effective coordination of communications with borrowers, both oral and written, related to Loss Mitigation or loan modification and foreclosure activities:  (i) to ensure that communications are timely and effective and are designed to avoid confusion to borrowers; (ii) to ensure continuity in the handling of borrowers' loan files during the Loss Mitigation, loan modification, and foreclosure process by personnel knowledgeable about a specific borrower's situation; (iii) to ensure reasonable and good faith efforts, consistent with applicable Legal Requirements, are engaged in Loss Mitigation and foreclosure prevention for delinquent loans, where appropriate; and (iv) to ensure that decisions concerning Loss Mitigation or loan modifications continue to be made and communicated in a timely fashion.  Prior to submitting the plan, the Bank shall conduct a review to determine whether processes involving past due mortgage loans or foreclosures overlap in such a way that they may impair or impede a borrower's efforts to effectively pursue a loan modification, and whether Bank employee compensation practices discourage Loss Mitigation or loan modifications.  The plan shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timeframe that is in excess of

19

one hundred twenty (120) days must be approved by the Examiner-in-Charge.  The plan shall include, at a minimum:

(a)  measures to ensure that staff handling Loss Mitigation and loan modification requests routinely communicate and coordinate with staff processing the foreclosure on the borrower's property;

(b)  appropriate deadlines for responses to borrower communications and requests for consideration of Loss Mitigation, including deadlines for decision-making on Loss Mitigation Activities, with the metrics established not being less responsive than the timelines in the HAMP program;

(c)  establishment of an easily accessible and reliable single point of contact for each borrower so that the borrower has access to an employee of the Bank to obtain information throughout the Loss Mitigation, loan modification, and foreclosure processes;

(d)  a requirement that written communications with the borrower identify such single point of contact along with one or more direct means of communication with the contact;

(e)  measures to ensure that the single point of contact has access to current information and personnel (in-house or third-party) sufficient to timely, accurately, and adequately inform the borrower of the current status of the Loss Mitigation, loan modification, and foreclosure activities;

(f)  measures to ensure that staff are trained specifically in handling mortgage delinquencies, Loss Mitigation, and loan modifications;

(g)  procedures and controls to ensure that a final decision regarding a borrower's loan modification request (whether on a trial or permanent basis) is made and communicated to the borrower in writing, including the reason(s) why the borrower did not qualify for the trial or

permanent modification (including the net present value calculations utilized by the Bank, if applicable) by the single point of contact within a reasonable period of time before any foreclosure sale occurs;

(h)  procedures and controls to ensure that when the borrower's loan has been approved for modification on a trial or permanent basis that:  (i) no foreclosure or further legal action predicate to foreclosure occurs, unless the borrower is deemed in default on the terms of the trial or permanent modification; and (ii) the single point of contact remains available to the borrower and continues to be referenced on all written communications with the borrower;

(i)  policies and procedures to enable borrowers to make complaints regarding the Loss Mitigation or modification process, denial of modification requests, the foreclosure process, or foreclosure activities which prevent a borrower from pursuing Loss Mitigation or modification options, and a process for making borrowers aware of the complaint procedures;

(j)  procedures for the prompt review, escalation, and resolution of borrower complaints, including a process to communicate the results of the review to the borrower on a timely basis;

(k)  policies and procedures to ensure that payments are credited in a prompt and timely manner; that payments, including partial payments to the extent permissible under the terms of applicable legal instruments, are applied to scheduled principal, interest, and/or escrow before fees, and that any misapplication of borrower funds is corrected in a prompt and timely manner;

(l)  policies and procedures to ensure that timely information about Loss Mitigation options is sent to the borrower in the event of a delinquency or default, including plain language notices about loan modification and the pendency of foreclosure proceedings;

21

(m) policies and procedures to ensure that foreclosure, Loss Mitigation, and loan modification documents provided to borrowers and third parties are appropriately maintained and tracked, and that borrowers generally will not be required to resubmit the same documented information that has already been provided, and that borrowers are notified promptly of the need for additional information; and

(n) policies and procedures to consider loan modifications or other Loss Mitigation Activities with respect to junior lien loans owned by the Bank, and to factor the risks associated with such junior lien loans into loan loss reserving practices, where the Bank services the associated first lien mortgage and becomes aware that such first lien mortgage is delinquent or has been modified. Such policies and procedures shall require the ongoing maintenance of appropriate loss reserves for junior lien mortgages owned by the Bank and the charge-off of such junior lien loans in accordance with FFIEC retail credit classification guidelines.

## ARTICLE X

## RISK ASSESSMENT AND RISK MANAGEMENT PLAN

(1) Within ninety (90) days of this Order, the Bank shall conduct a written, comprehensive assessment of the Bank's risks in mortgage servicing operations, particularly in the areas of Loss Mitigation, foreclosure, and the administration and disposition of other real estate owned, including, but not limited to, operational, compliance, transaction, legal, and reputational risks.

(2) The Bank shall develop an acceptable plan to effectively manage or mitigate identified risks on an ongoing basis, with oversight by the Bank's senior risk managers, senior

management, and the Board.  The assessment and plan shall be provided to the Deputy

Comptroller and the Examiner-in-Charge within one hundred twenty (120) days of this Order.


## ARTICLE XI

### APPROVAL, IMPLEMENTATION AND REPORTS

(1)  The Bank shall submit the written plans, programs, policies, and procedures required

by this Order for review and determination of no supervisory objection to the Deputy

Comptroller and the Examiner-in-Charge within the applicable time periods set forth in Articles

II through X.  The Bank shall adopt the plans, programs, policies, and procedures required by

this Order upon submission to the OCC, and shall immediately make any revisions requested by

the Deputy Comptroller or the Examiner-in-Charge.  Upon adoption, the Bank shall immediately

implement the plans, programs, policies, and procedures required by this Order and thereafter

fully comply with them.

(2)  During the term of this Order, the required plans, programs, policies, and procedures

shall not be amended or rescinded in any material respect without the prior written approval of

the Deputy Comptroller or the Examiner-in-Charge (except as otherwise provided in this Order).

(3)  During the term of this Order, the Bank shall revise the required plans, programs,

policies, and procedures as necessary to incorporate new or changes to applicable Legal

Requirements and supervisory guidelines.

(4)  The Board shall ensure that the Bank has processes, personnel, and control systems

to ensure implementation of and adherence to the plans, programs, policies, and procedures

required by this Order.

(5)  Within thirty (30) days after the end of each calendar quarter following the date of this Order, the Bank shall submit to the OCC a written progress report detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof.  The progress report shall include information sufficient to validate compliance with this Order, based on a testing program acceptable to the OCC that includes, if required by the OCC, validation by third-party independent consultants acceptable to the OCC.  The OCC may, in writing, discontinue the requirement for progress reports or modify the reporting schedule.

(6)  All communication regarding this Order shall be sent to:

> (a)  Sally G. Belshaw
> Deputy Comptroller
> Large Bank Supervision
> Office of the Comptroller of the Currency
> 250 E Street, SW
> Washington, DC 20219

> (b)  Scott N. Waterhouse
> Examiner-in-Charge
> National Bank Examiners
> 1166 Avenue of the Americas, 21st Floor
> New York, NY  10036

## ARTICLE XII

### COMPLIANCE AND EXTENSIONS OF TIME

(1)  If the Bank contends that compliance with any provision of this Order would not be feasible or legally permissible for the Bank, or requires an extension of any timeframe within this Order, the Board shall submit a written request to the Deputy Comptroller asking for relief.  Any written requests submitted pursuant to this Article shall include a statement setting forth in detail the special circumstances that prevent the Bank from complying with a provision, that require

24

the Deputy Comptroller to exempt the Bank from a provision, or that require an extension of a timeframe within this Order.

(2)  All such requests shall be accompanied by relevant supporting documentation, and to the extent requested by the Deputy Comptroller, a sworn affidavit or affidavits setting forth any other facts upon which the Bank relies.  The Deputy Comptroller's decision concerning a request is final and not subject to further review.


## ARTICLE XIII

## OTHER PROVISIONS

(1)  Although this Order requires the Bank to submit certain actions, plans, programs, policies, and procedures for the review or prior written determination of no supervisory objection by the Deputy Comptroller or the Examiner-in-Charge, the Board has the ultimate responsibility for proper and sound management of the Bank.

(2)  In each instance in this Order in which the Board is required to ensure adherence to, and undertake to perform certain obligations of the Bank, it is intended to mean that the Board shall:

(a)  authorize and adopt such actions on behalf of the Bank as may be necessary for the Bank to perform its obligations and undertakings under the terms of this Order;

(b)  require the timely reporting by Bank management of such actions directed by the Board to be taken under the terms of this Order;

(c)  follow-up on any material non-compliance with such actions in a timely and appropriate manner; and

(d)  require corrective action be taken in a timely manner of any material non-compliance with such actions.

(3)  If, at any time, the Comptroller deems it appropriate in fulfilling the responsibilities placed upon him by the several laws of the United States to undertake any action affecting the Bank, nothing in this Order shall in any way inhibit, estop, bar, or otherwise prevent the Comptroller from so doing.

(4)  This Order constitutes a settlement of the cease and desist proceeding against the Bank contemplated by the Comptroller, based on the unsafe or unsound practices described in the Comptroller's Findings set forth in Article I of this Order.  Provided, however, that nothing in this Order shall prevent the Comptroller from instituting other enforcement actions against the Bank or any of its institution-affiliated parties, including, without limitation, assessment of civil money penalties, based on the findings set forth in this Order, or any other findings.

(5)  This Order is and shall become effective upon its execution by the Comptroller, through his authorized representative whose hand appears below.  The Order shall remain effective and enforceable, except to the extent that, and until such time as, any provision of this Order shall be amended, suspended, waived, or terminated in writing by the Comptroller.

(6)  Any time limitations imposed by this Order shall begin to run from the effective date of this Order, as shown below, unless the Order specifies otherwise.

(7)  The terms and provisions of this Order apply to the Bank and its subsidiaries, even though those subsidiaries are not named as parties to this Order.  The Bank shall integrate any foreclosure or mortgage servicing activities done by a subsidiary into its plans, policies, programs, and processes required by this Order.  The Bank shall ensure that its subsidiaries comply with all terms and provisions of this Order.

26

(8)  This Order is intended to be, and shall be construed to be, a final order issued pursuant to 12 U.S.C. § 1818(b), and expressly does not form, and may not be construed to form, a contract binding the Comptroller or the United States.  Nothing in this Order shall affect any action against the Bank or its institution-affiliated parties by a bank regulatory agency, the United States Department of Justice, or any other law enforcement agency, to the extent permitted under applicable law.

(9)  The terms of this Order, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

(10)  Nothing in the Stipulation and Consent or this Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under the Stipulation and Consent or this Order.

(11)  The Bank consents to the issuance of this Order before the filing of any notices, or taking of any testimony or adjudication, and solely for the purpose of settling this matter without a formal proceeding being filed.


IT IS SO ORDERED, this 13th day of April, 2011.



    /s/
Sally G. Belshaw
Deputy Comptroller
Large Bank Supervision

## UNITED STATES OF AMERICA
## DEPARTMENT OF THE TREASURY
## COMPTROLLER OF THE CURRENCY

| | |
|---|---|
| ) | |
| **In the Matter of:** ) | |
| JPMorgan Chase Bank, National Association ) | AA-EC-11-15 |
| New York, NY ) | |
| ) | |

## STIPULATION AND CONSENT TO THE ISSUANCE
## OF A CONSENT ORDER

The Comptroller of the Currency of the United States of America ("Comptroller") intends to impose a cease and desist order on JPMorgan Chase Bank, National Association ("Bank") pursuant to 12 U.S.C. § 1818(b), for unsafe or unsound banking practices relating to mortgage servicing and the initiation and handling of foreclosure proceedings.

The Bank, in the interest of compliance and cooperation, enters into this Stipulation and Consent to the Issuance of a Consent Order ("Stipulation") and consents to the issuance of a Consent Order, dated April 13, 2011 ("Consent Order");

In consideration of the above premises, the Comptroller, through his authorized representative, and the Bank, through its duly elected and acting Board of Directors, stipulate and agree to the following:

## ARTICLE I
## JURISDICTION

(1)     The Bank is a national banking association chartered and examined by the Comptroller pursuant to the National Bank Act of 1864, as amended, 12 U.S.C. § 1 *et seq.*

(2)    The Comptroller is "the appropriate Federal banking agency" regarding the Bank pursuant to 12 U.S.C. §§ 1813(q) and 1818(b).

(3)    The Bank is an "insured depository institution" within the meaning of 12 U.S.C. § 1818(b)(1).

(4)    For the purposes of, and within the meaning of 12 C.F.R. §§ 5.3(g)(4), 5.51(c)(6), and 24.2(e)(4), this Consent Order shall not be construed to be a "cease and desist order" or "consent order", unless the OCC informs the Bank otherwise.

## ARTICLE II
## AGREEMENT

(1)    The Bank, without admitting or denying any wrongdoing, consents and agrees to issuance of the Consent Order by the Comptroller.

(2)    The Bank consents and agrees that the Consent Order shall (a) be deemed an "order issued with the consent of the depository institution" pursuant to 12 U.S.C. § 1818(h)(2), (b) become effective upon its execution by the Comptroller through his authorized representative, and (c) be fully enforceable by the Comptroller pursuant to 12 U.S.C. § 1818(i).

(3)    Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the Comptroller may enforce any of the commitments or obligations herein undertaken by the Bank under his supervisory powers, including 12 U.S.C. § 1818(i), and not as a matter of contract law.  The Bank expressly acknowledges that neither the Bank nor the Comptroller has any intention to enter into a contract.

2

(4)     The Bank declares that no separate promise or inducement of any kind has been made by the Comptroller, or by his agents or employees, to cause or induce the Bank to consent to the issuance of the Consent Order and/or execute the Consent Order.

(5)     The Bank expressly acknowledges that no officer or employee of the Comptroller has statutory or other authority to bind the United States, the United States Treasury Department, the Comptroller, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Comptroller's exercise of his supervisory responsibilities.

(6)     The OCC releases and discharges the Bank from all potential liability for a cease and desist order that has been or might have been asserted by the OCC based on the banking practices described in the Comptroller's Findings set forth in Article I of the Consent Order, to the extent known to the OCC as of the effective date of the Consent Order. However, the banking practices alleged in Article I of the Consent Order may be utilized by the OCC in other future enforcement actions against the Bank or its institution-affiliated parties, including, without limitation, to assess civil money penalties or to establish a pattern or practice of violations or the continuation of a pattern or practice of violations. This release shall not preclude or affect any right of the OCC to determine and ensure compliance with the terms and provisions of this Stipulation or the Consent Order.

(7)     The terms and provisions of the Stipulation and the Consent Order shall be binding upon, and inure to the benefit of, the parties hereto and their successors in interest. Nothing in this Stipulation or the Consent Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any

3

benefit or any legal or equitable right, remedy or claim under this Stipulation or the Consent Order.

ARTICLE III
WAIVERS

(1)    The Bank, by consenting to this Stipulation, waives:

       (a)    the issuance of a Notice of Charges pursuant to 12 U.S.C. § 1818(b);

       (b)    any and all procedural rights available in connection with the issuance of the Consent Order;

       (c)    all rights to a hearing and a final agency decision pursuant to 12 U.S.C. §§ 1818(b) and (h), 12 C.F.R. Part 19;

       (d)    all rights to seek any type of administrative or judicial review of the Consent Order;

       (e)    any and all claims for fees, costs or expenses against the Comptroller, or any of his agents or employees, related in any way to this enforcement matter or this Consent Order, whether arising under common law or under the terms of any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412; and

       (f)    any and all rights to challenge or contest the validity of the Consent Order.

4

ARTICLE IV
OTHER PROVISIONS

(1)     The provisions of this Stipulation shall not inhibit, estop, bar, or otherwise prevent the Comptroller from taking any other action affecting the Bank if, at any time, it deems it appropriate to do so to fulfill the responsibilities placed upon it by the several laws of the United States of America.

(2)     Nothing in this Stipulation shall preclude any proceedings brought by the Comptroller to enforce the terms of this Consent Order, and nothing in this Stipulation constitutes, nor shall the Bank contend that it constitutes, a waiver of any right, power, or authority of any other representative of the United States or an agency thereof, including, without limitation, the United States Department of Justice, to bring other actions deemed appropriate.

(3)     The terms of the Stipulation and the Consent Order are not subject to amendment or modification by any extraneous expression, prior agreements or prior arrangements between the parties, whether oral or written.


IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller as his representative, has hereunto set her hand on behalf of the Comptroller.


/s/                                                                          April 13, 2011
_____                    _____
Sally G. Belshaw                                                  Date
Deputy Comptroller
Large Bank Supervision


5

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting

Board of Directors of the Bank, have hereunto set their hands on behalf of the Bank.


___/s/_____          ___3/30/2011_____
James Dimon                      Date


___/s/_____          ___4/4/2011_____
Douglas Braunstein               Date


___/s/_____          ___3/30/2011_____
Barry Zubrow                     Date


___/s/_____          ___3/30/2011_____
Frank Bisignano                  Date


___/s/_____          ___3/30/2011_____
Laban Jackson                    Date


___/s/_____          ___3/31/2011_____
James Crown                      Date


6

# EXHIBIT

# B

# EXHIBIT B

**Certificate of Status and Certificate Of No Record**

**Edward C. Tidwell vs. JPMorgan Chase Bank, N.A., et al.**
**United States District Court, Northern District of California**

# State of California
## Secretary of State

### CERTIFICATE OF STATUS

**ENTITY NAME:**   CHASE HOME FINANCE LLC

**REGISTERED IN CALIFORNIA AS:**   CHASE HOME FINANCE LLC

| | |
|---|---|
| **FILE NUMBER:** | 200502410155 |
| **REGISTRATION DATE:** | 01/20/2005 |
| **TYPE:** | FOREIGN LIMITED LIABILITY COMPANY |
| **JURISDICTION:** | DELAWARE |
| **STATUS:** | CANCELLED |

I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

The records of this office indicate the entity filed a Certificate of Cancellation on January 20, 2005 and the entity is no longer authorized to transact intrastate business in California.



**IN WITNESS WHEREOF**, I execute this certificate and affix the Great Seal of the State of California this day of April 3, 2012.

**DEBRA BOWEN**
Secretary of State

NP-25 (REV 1/2007)

# State of California
## Secretary of State

## CERTIFICATE OF NO RECORD
## LIMITED LIABILITY COMPANY

I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

That, the Corporations Code of the State of California provides for the execution and acknowledgment of the Articles of Organization and the subsequent filing in the office of the Secretary of State and,

That, the Corporations Code of the State of California provides for the filing in the office of the Secretary of State of an Application for Registration in order to register a Foreign Limited Liability Company to transact intrastate business in this State.

I further certify that no record has been found in the Limited Liability Company files of this office of a California or Foreign Limited Liability Company, active or inactive, of the name: **JPM SPECIALTY MORTGAGE LLC**

Please note that the search that was conducted was restricted to current Limited Liability Company names. Therefore, if you requested information for a Limited Liability Company under its previous name, those records are not available and cannot be searched.

IN WITNESS WHEREOF, I execute this certificate and affix the Great Seal of the State of California this day of February 2, 2011.



**DEBRA BOWEN**
**Secretary of State**

*NP-25 (REV 1/2007)*

GNM
OSP 06 99731

# State of California
## Secretary of State

## CERTIFICATE OF NO RECORD
## LIMITED LIABILITY COMPANY

I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

That, the Corporations Code of the State of California provides for the execution and acknowledgment of the Articles of Organization and the subsequent filing in the office of the Secretary of State and,

That, the Corporations Code of the State of California provides for the filing in the office of the Secretary of State of an Application for Registration in order to register a Foreign Limited Liability Company to transact intrastate business in this State.

I further certify that no record has been found in the Limited Liability Company files of this office of a California or Foreign Limited Liability Company, active or inactive, of the name: **JPMC SPECIALTY MORTGAGE LLC**

Please note that the search that was conducted was restricted to current Limited Liability Company names. Therefore, if you requested information for a Limited Liability Company under its previous name, those records are not available and cannot be searched.

IN WITNESS WHEREOF, I execute this certificate and affix the Great Seal of the State of California this day of March 24, 2011.



**DEBRA BOWEN**
**Secretary of State**

*NP-25 (REV 1/2007)*

JCT

OSP 06 9



**Secretary of State**
**Business Programs Division**
P.O. Box 944260, Sacramento, CA 94244-2600

March 24, 2011

EDWARD C TIDWELL
RE:   JPMC SPECIALTY MORTGAGE LLC

This letter is in response to your request for information.

There is no record of the entity or filing you requested.

Certification and Records
Business Entities Section

BE CR-MISC (Est. 01/2011)

# EXHIBIT

# C

# EXHIBIT C

**Deed of Trust**

Edward C. Tidwell vs. JPMorgan Chase Bank, N.A., et al.
United States District Court, Northern District of California

FIRST AMERICAN TITLE CO**AN

Recording Requested By:
Argent Mortgage Company, LLC

Return To:
Argent Mortgage Company, LLC
P.O. Box 5047
Rolling Meadows, IL 60008

CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
DOC- 2005-0305754-00

Acct 6- First American Title
Monday, AUG 15, 2005 08:00:00
MIC   $1.00 MOD  $19.00 REC  $23.00
TCF  $18.00 DAF   $1.80 REF   $0.20

Ttl Pd  $63.00      Nbr-0002847006
                        ENG/R2/1-19

Prepared By:Argent Mortgage Company, LLC
Robert Abitia
One City Boulevard West
Orange, CA 92868

————————[Space Above This Line For Recording Data]————————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated August 2, 2005
together with all Riders to this document.
(B) "Borrower" is EDWARD TIDWELL, A Married Man, As His Sole and Separate Property

Borrower is the trustor under this Security Instrument.
(C) "Lender" is Argent Mortgage Company, LLC

Lender is a Limited Liability Company
organized and existing under the laws of Delaware

0084459197-9505

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3005  1/01

VMP®-6(CA) (0005)
Page 1 of 15                    Initials: ECT

08/02/2005 6:09:01 PM

VMP MORTGAGE FORMS - (800)521-7291

d06-01ca (05/2005)Rev.01

ARG 0176

305754

Lender's address is One City Boulevard West  Orange, CA 92868

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is Town and Country Title Services, Inc.

(E) "Note" means the promissory note signed by Borrower and dated August 2, 2005
The Note states that Borrower owes Lender four hundred fifty-five thousand and 00/100
Dollars
(U.S. $455,000.00         ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than September 1, 2035
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

0084459197 - 9505
Initials: _____

VMP ®-6(CA) (0005)          Page 2 of 15          08/02/2005 6:09:01          Form 3005  1/01

D06-02CA (05/2005)Rev.01                                                      ARG 0177

305754

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of CONTRA COSTA :
[Type of Recording Jurisdiction]                                    [Name of Recording Jurisdiction]
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF:

Parcel ID Number: 056-230-030-1                  which currently has the address of
5157 ROUNDUP WAY                                                              [Street]
ANTIOCH                                    [City], California 94531        [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."
    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

0084459197-9505
Initials: ___
-6(CA) (0005)        Page 3 of 15   08/02/2005 6:09:01 PM   Form 3005   1/01

(05/2005)Rev.01                                                        ARG 0178

305754

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

0084459197 - 9505
Initials: [signature]

D06-04CA (05/2005)Rev.01

ARG 0179

305754

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

0084459197 - 9505
Initials: _ECC_

VMP -6(CA) (0005)        Page 5 of 15     08/02/2005 6:09:01      Form 3005   1/01

D06-05CA (05/2005)Rev.01

ARG 0180

305754

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

D06-06CA (05/2005)Rev.01

ARG 0181

305754

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

0084459197 - 9505
Initials: ECT

VMP -6(CA) (0005)         Page 7 of 16     08/02/2005 6:09:01     Form 3005   1/01

D06-07CA (05/2005)Rev.01

ARG 0182

305754

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

0084459197 - 9505

Initials:

-6(CA) (0005)            Page 8 of 15     08/02/2005 6:09:01     Form 3005   1/01

D06-08CA (05/2005)Rev.01

ARG 0183

305754

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

0084459197 - 9505
Initials: _ECT_

305754

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

0084459197 - 9505
Initials: _____

305754

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

0084459197 - 9505
Initials: _ECT_

305754

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

0084459197 - 9505
Initials: ___

-6(CA) (0005)    Page 12 of 15    08/02/2005 6:09:01    Form 3005  1/01

D06-12CA (05/2005)Rev.01

ARG 0187

305754

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

0084459197-9505
Initials: ___

-6(CA) (0005)          Page 13 of 15          08/02/2005 6:09:01          Form 3005  1/01

ARG 0188

305754

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          *Edward Tidwell*_____ (Seal)
                                        EDWARD TIDWELL        -Borrower


_____          _____ (Seal)
                                                                      -Borrower


_____ (Seal)   _____ (Seal)
                              -Borrower                               -Borrower


_____ (Seal)   _____ (Seal)
                              -Borrower                               -Borrower


_____ (Seal)   _____ (Seal)
                              -Borrower                               -Borrower


0084459197-9505



(05/2005)Rev.01

ARG 0189

305754

**State of California**

County of _Contra Costa_ } ss:

On _3rd / August / 2005_ before me, _Julio A. Gonzales_
    Day/Month/Year                                 Notary Public

personally appeared

_Edward Tidwell_

personally known to me (or proven to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument

Witness my hand and official seal.

_____ (Seal)
Notary Public



JULIO A. GONZALES
Comm. # 1552641
NOTARY PUBLIC-CALIFORNIA
Contra Costa County
My Comm. Expires Feb. 13, 2009

0084459197 - 9505

08/02/2005 6:09:01 PM

400-15CA (05/2005)Rev.01

ARG 0190